UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                           :
DWIGHT JEROLMON                            :          3:10 CV 267 (CSH)
                                           :
V.                                         :
                                           :
MICHAEL J. ASTRUE,                         :
COMMISSIONER OF SOCIAL SECURITY            :          DATE: MARCH 9, 2011
                                           :
------------------------------------------------------ x
```

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS,
AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"].

## I.  ADMINISTRATIVE PROCEEDINGS

On January 23, 2008, plaintiff Dwight Jerolmon filed his application for DIB, alleging

an inability to perform substantial gainful activity since February 11, 2004. (<u>See</u> Certified

Transcript of Administrative Proceedings, dated March 29, 2010 ["Tr."] 99-100).  Plaintiff's

claim for benefits was denied initially, and upon reconsideration. (Tr. 43-44, 47-54).  On July

30, 2008, plaintiff filed a request for a hearing, which hearing was held on August 19, 2009

before Administrative Law Judge ["ALJ"] Deirdre R. Horton, at which plaintiff and a medical

expert testified.  (<u>See</u> Tr. 18-42, 55; <u>see also</u> Tr. 56-59, 62-81, 82-88).  Plaintiff was

represented by counsel.  (Tr. 45-46, 60-61; <u>see also</u> Tr. 89-97).  On October 20, 2009, ALJ

Horton issued her decision denying plaintiff's claim for benefits. (<u>See</u> Tr. 4-17).  On January

28, 2010, the Decision Review Board issued its Notice of Decision Review Board Action,

informing plaintiff that it did not complete its review within the ninety-day time frame, thus

rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).

Plaintiff filed his Complaint on February 23, 2010 (Dkt. #1), and on March 1, 2010, Senior United States District Judge Charles S. Haight, Jr. referred this matter to this Magistrate Judge.  (Dkt. #3).  On May 4, 2010, defendant filed his Answer.  (Dkt. #7).[1] Thereafter, on May 26, 2010, plaintiff filed his Motion for Judgment on the Pleadings and brief in support  (Dkt. #8).  Defendant filed his Motion for Order Affirming the Decision of the Commissioner and brief in support on July 19, 2010 (Dkt. #12; see Dkts. ##9-11), and on July 27, 2010, plaintiff filed his reply brief in further support of his Motion for Judgment. (Dkt. #13).

For the reasons stated below, plaintiff's Motion for Judgment on the Pleadings (Dkt. #8) is denied, and defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. #12) is granted.

## II. FACTUAL BACKGROUND

Plaintiff was born in 1952 and is fifty-eight years old (Tr. 22, 43, 44, 99, 132); he is married (Tr. 22, 100) and has three adult children (Tr. 22).  Plaintiff graduated high school, completing the twelfth grade.  (Tr. 24, 140).

According to plaintiff, he is disabled as a result of his hypertensive cardiovascular disease, high blood pressure, and depression.  (Tr. 136).  Plaintiff claims that he becomes fatigued "fast and often," that he suffers from constant pain, that he uses the bathroom frequently, and that he "cannot sit, stand, walk, bend, focus or concentrate" for long durations.  (Id.).  Additionally, according to plaintiff, he has back pain, fatigue, a lack of stamina, day and night sweats, frequent diarrhea, depression, anxiety and panic attacks.

---

[1]Attached to defendant's answer is a certified copy of the two-volume, 1,037-page transcript of the administrative record, dated March 29, 2010.  The medical records from 2003 through 2007 generally appear twice.

(Tr. 145, 147). His symptoms "come and go all day and night[,]" and he reports that his physical activity is limited to light activities with frequent breaks. (Tr. 146). Further, plaintiff reports that he is able to care for his personal needs "at a slower rate and limited ability." (Tr. 129, 159). He also reports that his daily activities are limited due to his medical conditions. (Id.).

Plaintiff has been taking multiple medications for his illnesses including Clonazepam for anxiety and hypertension, Finasteride for his prostate, Hyzaar for high blood pressure, Sertraline for depression (Tr. 128, 139, 146, 150, 159, 167), Acetaminophen for his foot and back pain (Tr. 146, 150, 167), Oxybutynin Chloride for his frequent urination, Albuterol for his breathing problems, Zantec for stomach problems, allergy pills for leaves and dust (Tr. 167), Viagra (Tr. 178), and Zoloft (Tr. 186, 193).

Plaintiff was employed by Comcast Cable as a supervisor/team leader from 1974-2004. (Tr. 137, 142-44, 166; see also Tr. 23, 101-02, 109-21). In that role, plaintiff used machines, tools, equipment, and technical knowledge, he completed reports, and he led, trained, hired and fired employees. (Tr. 137, 143). Additionally, plaintiff assigned and supervised the work of installers and technicians, performed office work safety inspections and installation, checked inventory, and performed field work running wires, digging holes, and crawling in spaces. (Tr. 23, 143, 166). Plaintiff walked or stood for eight hours, sat for five hours, climbed, stooped, or kneeled for four hours, crouched for one hour, crawled or handled big objects for six hours and reached for five hours each day. (Tr. 137).[2] He had

---

[2]In a subsequent work history report, dated February 1, 2008, plaintiff reported that he walked, stood or sat for two hours, climbed for a quarter of an hour, stooped, kneeled, crouched, crawled, handled big objects and reached for a half hour, and wrote or handled small objects for three hours each day. (Tr. 143). Additionally, he reported that he carried a seventy pound ladder as needed and a forty pound box of cable daily. (Id.). The heaviest weight he lifted was seventy pounds, and he most frequently lifted twenty-five pounds. (Id.). He supervised fifteen people on

to lift and carry boxes of cable wire a few feet on a regular basis, although he approximated that he did not have to lift more than ten pounds. (Tr. 137). According to plaintiff, he "had to stop using ladders after [he] hurt [his] back in 1995." (Tr. 166.)

Plaintiff reports that he became unable to work on February 11, 2004, at which time he was laid off because he "lacked [the] stamina to continue working"; his onset date of disability is March 11, 2004 because, in his words, "due to [his] medical conditions[, he was] unable to seek new employment." (Tr. 23-24, 136, 144).

Plaintiff lives in a house with his family, and he takes care of a pet rabbit by bringing him food and water. (Tr. 148). However, according to plaintiff, his wife "does almost everything [else.]" (Tr. 149). Before his illness or condition, plaintiff was able to "carry heavy stuff, sit for long periods, bend over and get up, [and] kneel," all of which he cannot do now. (Id.). His conditions affect his sleep because he has to get up to use the bathroom and he has to change his shirt due to night sweats. (Id.). Plaintiff prepares his own meals daily, usually preparing very simple meals such as sandwiches and snacks. (Tr. 150). Plaintiff reports that he sweeps, vacuums, does laundry and mows the lawn with a self propelled mower once a week for approximately ten to fifteen minutes. (Tr. 151). Plaintiff goes outside "a couple of times a week[,]" and when he goes out, he travels by driving a car or riding in a car. (Id.). At his hearing, plaintiff testified that he would normally drive once a week, but when his wife was recovering from an operation, he drove more frequently. (Tr. 23). However, he also testified that his lower back hurts if he sits in a car for more than fifteen minutes and that his "right foot hurts from using the accelerator or the brake." (Tr. 22).

_____

average and three fourths of his time was spent supervising people. (Id.; see also Tr. 137).

4

He can go out alone.  (Tr. 151).  Plaintiff shops in stores and by computer for food, clothes, guitars, and electronics once a week for about one hour.  (Tr. 152).  He is able to pay bills, count change, handle a savings account and use a checkbook or money orders. (Id.).

According to plaintiff his hobbies are reading, watching television, using the computer, playing guitar and listening to music.  (Id.).  He does these activities "every day[,]" "a little at a time."  (Id.).  Changes to these activities since his illnesses began include falling asleep when he sits down to watch television and having to take frequent breaks. (Id.).  He shops with his wife, has dinner with her, goes to Wal-Mart and Target on a regular basis, and calls his children weekly.  (Tr. 153).  (Id.).  Plaintiff does not need to be reminded to go places and does not need someone to accompany him.  (Id.).

Plaintiff reports that he lacks motivation, his back hurts, and that he has to use the bathroom frequently since his illnesses began.  (Id.).  He reports that his illnesses affect his ability to lift, squat, bend, sit, kneel, and concentrate.  (Id.).  Plaintiff can only lift twenty pounds, he can squat, bend and kneel, but he reports that such movement hurts his back, and his concentration is affected because he has to "re-do, re-check, re-read."  (Id.). According to plaintiff, he can walk one mile before he has to stop and rest and he has to wait five minutes before he can resume walking.  (Tr. 154).  He can pay attention for three minutes.  (Id.).  Plaintiff reports that he does finish what he starts when possible and he will stop to take a break.  (Id.).  He follows written instructions "OK[,]" and he will remember two items of spoken instructions, but he "may forget the third."  (Id.).  Plaintiff distrusts police, bosses and authority figures.  (Id.).  He has never been fired or laid off from a job because of problems getting along with others; he reported he "could have been, but

wasn't." (Id.).[3]  When faced with stress, plaintiff will "fall apart" with "uncontrollable swearing." (Id.).  He has "many rituals" and does not handle changes in routine well. (Id.).  He has noticed unusual behavior or fears relating to germs, dirt, and elevators, and he reports being claustrophobic. (Id.).

Plaintiff's daily routine is as follows: at 7:30 a.m. he wakes up; at 8:15 a.m. he makes tea and toast for breakfast; from 9:00 a.m. to noon he watches news, checks the computer and plays guitar for a few minutes; at noon he makes a peanut butter and jelly sandwich for lunch, gets the mail, does paperwork and pays bills; from 4:00 p.m. to 6:00 p.m. he takes a nap; at 6:00 p.m. he watches television; at 6:30 p.m. he has dinner, watches television, checks the computer and watches additional television; at 10:00 p.m. he goes to bed.  (Tr. 155).  On Saturday or Sunday he "may go to the store" with his wife "while she shops." (Id.).  Plaintiff reports: "During the day, I have to pee about every [twenty] minutes.  I also have to dry myself off with a hair dryer at least that often because I have uncontrollable sweating from my lower back due to a blood disorder.  When I sit down, after a few minutes my pants will be very damp.  For that reason, I spend a lot of time standing.  I also have a back-ache from an auto accident several years ago." (Id.).

Plaintiff was diagnosed with Waldenstrom's macroglobulinemia around 1998, after he experienced excessive bloody noses.[4]  (See Tr. 24).  Plaintiff's medical history begins with

_____

[3]However, plaintiff testified that he was asked by one of the managers to leave his job with Comcast because he was not meeting performance.  (Tr. 23-24).

[4]Waldenstrom's macroglobulinemia is a malignant disorder of the blood characterized by the presence of abnormally large numbers of a white blood cell known as B lymphocytes.  As these cells accumulate in the body, excessive quantities of an antibody known as IgM are produced causing the blood to become thick and affecting the flow of blood through the smaller blood vessels.  http://www.webmd.com/cancer/waldenstroms-macroglobulinemia-1085 (Last visited October 8, 2010).

records of outpatient chemotherapy, Rituxan infusions, that plaintiff received on April 22, May 12 and October 30, 2003, and on May 20 and 26, and June 2 and 9, 2004, under the care of Dr. Lawrence Solomon, an internist at Yale University Health Services. (Tr. 490-97, 503, 720-27).[5] On May 24, 2004, plaintiff was seen by his oncologist, Dr. Arthur Levy, for "another cycle of Rituxan for his Waldenstrom's macroglobulinemia." (Tr. 465). Plaintiff was "feeling well." (Id.). Dr. Levy saw plaintiff again on August 5, 2004, at which time he noted again that plaintiff was "doing well." (Tr. 466). Dr. Levy continued plaintiff on Clonazepam for his anxiety. (Id.).[6] On September 2, 2004, plaintiff was seen by Dr. Solomon, who noted that plaintiff was very anxious, and he had high blood pressure readings, which he labeled "white coat hypertension." (Tr. 467-68; see Tr. 473, 571).[7]

Plaintiff was seen by Dr. John F. Setaro at the Cardiovascular Disease Prevention Center on September 13, 2004 for a twenty-four-hour evaluation of his blood pressure. (Tr. 572-83). The ambulatory blood pressure monitor study revealed normal average systolic and diastolic blood pressure on a twenty-four-hour basis, with high normal average systolic blood pressure on a daytime basis. (Tr. 572). A lifestyle modification with careful clinical follow-up was recommended. (Id.).[8]

On October 20 and November 17, 2004, plaintiff was seen by Dr. Solomon, and at

---

[5]In light of the nature of this illness, plaintiff underwent frequent blood work at the request of APRN Molly Meyer and/or Dr. Solomon, on January 22, April 2, and May 12, 2004. (Tr. 448-56, 457-64, 528-34, 535-42, 543-51).

[6]Meyer ordered additional blood work on July 9 and 28, 2004. (Tr. 430-47, 552-69).

[7]Five days later, plaintiff's examination at the Skin Cancer Detection Program at Yale University Health Services revealed a "benign exam"; a follow-up examination in one year was recommended. (Tr. 469).

[8]That same day, plaintiff underwent blood work at the request of Dr. Solomon. (Tr. 418-29, 584-95).

the latter appointment, Dr. Solomon ordered a cardiac ultrasound. (Tr. 471-72, 596, 606). Plaintiff was seen by Dr. Levy on December 2, 2004 for a follow-up of his Waldenstrom's macroglobulinemia with acquired von Willebrand disease;[9] plaintiff was feeling "very well, although he was recently noted to have a murmur" and an ultrasound showed "some left ventricular hypokinesis." (Tr. 470). Plaintiff underwent chemotherapy on December 2, 9, 16 and 23, 2004. (Tr. 486-89, 498-502, 716-19, 728-31). Plaintiff reported that he was feeling "great" with no side effects. (Tr. 501, 731).[10]

Plaintiff was seen at Yale Cardiovascular Nuclear Imaging and Exercise Laboratory on January 13, 2005 where he underwent a stress test under the care of Dr. Barry L. Zaret. (Tr. 607-27, 634-35).[11] On April 21, 2005, Dr. Levy authored a letter to Dr. Solomon, in which he noted that he was concerned that plaintiff may have more than white coat hypertension, so that Dr. Levy placed plaintiff on Hydrochlorothiazide, 25 mg day. (Tr. 473, 692). When plaintiff returned to Dr. Solomon on May 19, 2005, and on June 6, 2005, his blood pressure

---

[9]Von Willebrand disease is a bleeding disorder that affects the blood's ability to clot. http://www.nhlbi.nih.gov/health/dci/Diseases/vWD/vWD_WhatIs.html (Last visited October 20, 2010).

[10]Plaintiff had blood work, at Meyer's request, on November 1, 2004. (Tr. 409-17, 597-605).

[11]Plaintiff underwent blood work, again at the request of Dr. Solomon and/or Meyer, on January 25, April 8, June 6 and 20, and August 4, 2005. (Tr. 380-88, 391-96, 397-08, 628-37, 688-91, 695-700, 703-05, 734-39).

Plaintiff had an ophthalmology appointment on June 13, 2005 at Yale University Health Services. (Tr. 389-90, 701-02). He was seen by their dermatology department on September 26, 2005 for his "[a]nnual mole screen." (Tr. 504, 740). He returned to Yale University Health Services on October 12, 2005 to undergo "STD testing." (Tr. 505, 741). The next day, and again on December 29, 2005, plaintiff underwent blood work, again at Meyer's request. (Tr. 357-67, 371-79, 742-48, 752-62).

On October 25, 2005, plaintiff was seen for an ophthalmology consult at Yale University Health Services. (Tr. 368-69, 750-51).

was noted as "excellent." (Tr. 474-75, 693). On June 6, 13, and 20, 2005, plaintiff received his outpatient chemotherapy of Rituxan; plaintiff reported that he was "doing well" with "[n]o symptoms." (Tr. 475-77, 478-82, 484-85, 693-94, 706-11, 714-15). Plaintiff returned for an appointment with Dr. Solomon on July 1, 2005, at which plaintiff reported that he was "feeling well." (Tr. 482, 733).

Plaintiff began his counseling sessions with Dr. Andrew C. Porto, a psychologist, on May 27, 2005, and continued to see him somewhat regularly through the end of the year, on June 1 and 11, August 26, October 10, 14 and 20, November 3, 10 and 28, and December 5 and 15, 2005, during which he discussed his family and marital problems. (Tr. 1025-28).

On June 30, 2005, Dr. Levy saw plaintiff upon his completion of his fourth weekly dose of Rituxan maintenance. (Tr. 483, 732). He had a follow-up appointment with Dr. Levy on October 20, 2005, at which time plaintiff "looked generally well[,]" "with his only concern being family matters." (Tr. 370, 749).[12]

On January 5, 2006, plaintiff was seen by Dr. Levy for a follow-up of his Waldenstrom's macroglobulinemia; Dr. Levy noted that plaintiff had two years of Rituxan and was in remission. (Tr. 350-51, 769-70). In light of elevated liver function tests, Dr. Levy ordered a hepatitis profile, and suggested that plaintiff have an abdominal ultrasound. (Id.).[13]

_____

[12]On January 3, 2006, plaintiff saw Dr. Elizabeth Lincoln, also of Yale University Health Services, who noted that plaintiff was seeing a therapist for his depression and needed a colonoscopy screening. (Tr. 506, 763). Plaintiff had his colonoscopy on March 21, 2006, which yielded normal results. (Tr. 335-36, 786-87).

[13]Plaintiff underwent blood work, at Dr. Lincoln's request, on January 3, 5, 10 and 18, 2006. (Tr. 348-49, 352-56, 764-68, 771-72).

Plaintiff had blood work taken for Dr. Harris J. Foster, Jr., a urologist, also with Yale University Health Services, on January 23, 2006 to check plaintiff's testosterone and PSA; his PSA was slightly elevated. (Tr. 774-75; see Tr. 785).

Plaintiff also had blood work, at Meyer's request, on February 24, 2006. (Tr. 340-43, 778-

Twelve days later, on January 17, 2006, plaintiff underwent an abdominal ultrasound, which revealed that his gallbladder was "essentially filled with [gall] stones[,]" but there was no biliary ductal dilatation. (Tr. 347, 773). Eight days later, on January 25, 2006, plaintiff saw Dr. Elizabeth Lincoln, also of Yale University Health Services, to discuss the results of the ultrasound. (Tr. 507, 776).

On January 23 and February 3, 2006, plaintiff was seen by Dr. Harris J. Foster, Jr., a urologist at Yale University Health Services, who scheduled plaintiff for a transrectal ultrasound and biopsy in light of his slightly elevated PSA. (Tr. 337, 344, 777, 785).[14] The prostrate biopsy was performed on March 9, 2006, and Dr. Forster informed plaintiff six days later that the prostate biopsies were negative for neoplasia. (Tr. 338-39, 509, 782-84).[15]

Plaintiff saw Dr. Porto on February 7, 14 and 27, and March 10, 17 and 27, 2006, at which time he verbalized the stress he was under from the "development of new health problems." (Tr. 1029-30, 1032). In a letter, dated April 5, 2006, Dr. James L. Boyer, the Director of the Yale Liver Center, informed Meyer that plaintiff has hepatitis C genotype 3. (Tr. 334, 788; see also Tr. 508). Dr. Boyer did "not recommend biopsy" but opined that he should proceed with treatment, in consultation with plaintiff's oncologist, Dr. Levy. (Id.).

Plaintiff was seen again by Dr. Porto on April 7, 13, 21, and 28, 2006; plaintiff reported to Dr. Porto during the April 13 appointment that Dr. Michael Stitelman, his

---

81).

[14]See note 13 & accompanying text supra.

[15]On April 5 and 19, 2006, plaintiff underwent extensive blood work at the request of Meyer and Dr. Slawomir Mejnartowicz, an internist at Yale University Health Services. (Tr. 308-33, 789-803, 839-49). On July 7, 2006, plaintiff underwent blood work, again at Meyer's request. (Tr. 298-306, 808, 853-60). Dr. Foster ordered follow-up blood work regarding plaintiff's elevated PSA on September 12, 2006. (Tr. 294-96, 337, 810).

psychiatrist, "strongly recommended that [plaintiff] not [take the Interferon] treatment as severe depression usually occurs," although fifteen days later, plaintiff remarked that "even his guitar playing is reflecting his more relaxed and focused thinking." (Tr. 1031-32).

Plaintiff was seen for the first time by Dr. Slawomir Mejnartowicz, an internist at Yale University Health Services, on April 24, 2006, during which appointment, plaintiff's anxiety and depression were noted. (Tr. 510, 850). Plaintiff underwent a renal ultrasound on May 10, 2006 to "[f]urther evaluate right renal cystic structure." (Tr. 307, 851). The radiologist's impression was a "[s]imple appearing cyst in the right kidney" with an enlarged median lobe of the prostate. (Id.). On June 16, 2006, plaintiff returned to Dr. Mejnartowicz for a follow-up appointment, during which the doctor noted that plaintiff's anxiety was "better[,]" although he increased plaintiff's Zoloft. (Tr. 511, 852). Plaintiff was seen by Dr. Levy on July 13, 2006 for a follow-up of his Waldenstrom's macroglobulinemia with secondary von Willebrand's disease which was "well controlled with periodic Rituxan." (Tr. 297, 809). Plaintiff also saw Dr. Foster on September 18, 2006; after examination, Dr. Foster described plaintiff's prostate as "benign" so that plaintiff could return to yearly exams. (Tr. 293, 811).

Plaintiff saw Dr. Porto on May 4, June 6 and 23, and September 5, 12, 19, and 26, 2006 to discuss his marital relationship. (Tr. 1031, 1033-34). During the last appointment in that month, plaintiff reported that his wife told him he needed to leave since she could not live with someone with obsessive compulsive disorder ["OCD"]. (Tr. 1034).

Plaintiff had appointments with Dr. Stitelman on January 10, August 30, and October 3, 2006. (Tr. 805-07). In a letter dated October 3, 2006, Dr. Stitelman informed Carol Eggers, an APRN at Yale Medical Group, that plaintiff was under his psychiatric care, that plaintiff was "well aware of the psychiatric risks" of Interferon, and that plaintiff was "willing

to proceed with [I]nterferon treatment." (Tr. 804). Three days later, Dr. Mejnartowicz saw plaintiff for a three month follow-up appointment, in which the doctor noted that plaintiff's anxiety was "better[,]"and that he was still taking Zoloft. (Tr. 292, 812). On October 12, 2006, Meyer informed Eggers that there were "no contraindications for treatment with Interferon" for plaintiff. (Tr. 824).[16]

On October 24, 2006, plaintiff was seen by Eggers for the start of his treatment with Pegasys and Ribavirin for his hepatitis C. (Tr. 281-82, 834-35). Two days later, plaintiff was seen by Dr. Levy, who noted that plaintiff was "in remission" for his Waldenstrom's macroglobulinemia. (Tr. 278-79, 837-38). During plaintiff's next appointment on November 14, 2006, Eggers noted that plaintiff's depression was "currently stable." (Tr. 266, 273, 525). At his November 29, 2006 appointment with Eggers, plaintiff reported mild nausea, and being tired the first two days after his shot, but "[o]ther than that, he [was] doing well," with a good appetite, mood and concentration. (Tr. 264-65, 523-24). At his next appointment with Eggers on December 13, 2006, plaintiff was symptomatic with anemia; he was started on Procrit, and Eggers noted that plaintiff "may be depressed." (Tr. 640-41).[17]

Plaintiff had sessions with Dr. Porto on October 16 and November 27, 2006, and on January 27, 2010. (Tr. 1034, 1036). At the January 27 session, Dr. Porto observed that plaintiff was "feeling weak" from his treatments, but the doctor added that plaintiff "needs

---

[16]On October 6, 2006, plaintiff underwent several blood tests ordered by Dr. Mejnartowicz (Tr. 168-77, 813-23); plaintiff underwent blood work at Meyer's request one week later. (Tr. 283-89, 827-33).

On October 13, 2006, plaintiff also had an eye examination through Yale University Health Services, although the majority of the record relating to this examination is illegible. (Tr. 249-50, 290-91, 651-52, 825-26).

[17]Plaintiff underwent blood work, at the request of Dr. Mejnartowicz and/or Meyer, on November 7 and 21, December 7, 20 and 27, and January 6 and 22, 2007. (Tr. 235-48, 251-63, 274-77, 512-15, 526-27, 638-39, 642-50, 653-66).

to . . . get a job and socialize with others." (Tr. 1036).

Dr. Thomas Fynan, another oncologist with the Yale University Health Services, saw plaintiff on January 25, 2007 for a follow-up of his Waldenstrom's macroglobulinemia with secondary von Willebrand's disease and hepatitis C; Dr. Fynan recommended that plaintiff continue on Procrit and Ribavirin. (Tr. 233-34, 667-68). Plaintiff was seen by Eggers on February 6, 2007, for his chronic hepatitis C, at which plaintiff's complaint of "minor weakness" was noted, he stated that he felt better when he took naps in the afternoon, and he was continuing to "experience anemia and [was] symptomatic." (Tr. 229-30, 671-72). Twenty days later, Dr. Mejnartowicz saw plaintiff for a follow-up regarding plaintiff's anemia and hepatitis C; plaintiff had a 24-hour "bug" the day before. (Tr. 220-21, 680-81). Plaintiff returned to Dr. Fynan on April 19, 2007 during which appointment Dr. Fynan noted that plaintiff's Waldenstrom's macroglobulinemia and hepatitis C were in remission, "[h]is fatigue and muscle aches have resolved and he [felt] well today[,]" and that he would continue to check on plaintiff's anemia. (Tr. 201-02, 872-73). On July 9, 2007, plaintiff presented to Dr. Cheryl Walters, another internist at Yale University Health Services after having a high fever the night before, diagnosed as sinusitis. (Tr. 197-98, 876-77).[18]

On July 30, 2007, plaintiff was seen by Dr. Foster for a follow-up relating to his formerly elevated PSA, which was now within normal range. (Tr. 195, 879; see also Tr. 878). Dr. Foster reported that plaintiff "does have some lower urinary tract symptoms, particularly hesitancy, nocturia, and decreased force of stream to the extent where [plaintiff] would like to try a medication." (Tr. 195, 879). He noted that "these symptoms will worsen

_____

[18]On February 3, 9 and 23, March 14 and April 5 and 16, and May 21, 2007, plaintiff underwent blood work at the request of Dr. Mejnartowicz or Meyer. (Tr. 199-200, 203-19, 222-28, 231-32, 669-70, 673-79, 682-87, 861-71, 874-75).

when [the plaintiff] takes his medications for chronic sinusitis," although Dr. Foster reported that a physical exam revealed a benign prostate; plaintiff was treated with Proscar. (Id.).[19] On August 27, 2007, plaintiff was seen by Dr. Mejnartowicz for a follow-up examination, at which Dr. Mejnartowicz reported that plaintiff felt well and his treatment plan was to continue plaintiff on the same routine with assessment of his benign essential hypertension and anxiety disorder NOS. (See Tr. 186-87, 888-89).

On October 11, 2007, plaintiff returned to Dr. Fynan for a follow-up of his Waldenstrom's macroglobulinemia with secondary von Willebrand's disease. (See Tr. 178-79, 896-97). In addition to these two illnesses, Dr. Fynan listed plaintiff's "[a]ctive [p]roblems" as including: anxiety disorder NOS, benign essential hypertension, cholelithiasis, hepatitis C, hyperglycemia, overweight, serology prostate-specific antigen elevated, symptoms occur seasonally worse in spring with bronchospasm, and ultrasound renal kidney cyst right. (Tr. 178). Plaintiff reported that he had been "very well over the summer and early fall with no major medical issues." (Tr. 178-79, 896-97). Plaintiff had no specific complaints at that visit, and reported no fevers, no night sweats, no bruising or bleeding, and no adenopathy, and plaintiff's weight was stable. (Tr. 179, 896). Dr. Fynan noted that plaintiff had been in remission from his Waldenstrom's macroglobulinemia two years and four months after completing therapy; plaintiff had anemia which was "mild" and had "improved from the summer"; and plaintiff's secondary von Willebrand's disease was in remission as was his

---

[19]Dr. Mary Tomayko at Yale University Health Services saw plaintiff on July 31, 2007, for complaints relating to an "itchy papule on [his] back." (Tr. 192-93, 881-83). Dr. Tomayko recommended an annual full body examination (id.), so that same day, plaintiff was treated at the Yale Dermatopathology Laboratory, and on August 6, 2007, plaintiff was diagnosed with left chest compound melanocytic nevus. (Tr. 194, 880).

hepatitis C.  (Id.).[20]

Plaintiff returned to Dr. Porto on February 21, 2008, during which appointment he revealed that he started his application for SSDI.  (Tr. 1035).  He stated that he was content staying home and that he was "miserable emotionally[,]" in light of his continuing marital and health issues.  (Id.).  Plaintiff returned to Dr. Porto on March 4, 2008, when he reported that he was "[f]eeling down," and that he had no energy.  (Id.).  Later that day, plaintiff underwent a mental status examination by Lance Hart, PhD for Connecticut Disability Determination Services ["CT DDS"].  (Tr. 906-09).  Plaintiff reported to Dr. Hart that he was unable to work due to low back pain, he had several courses of chemotherapy, he had hepatitis C with Interferon and Ribavirin treatment, of which he admitted he was now cured, he had night sweats, and he did not sleep through the night and he had to urinate often, he was sensitive to the cold, was allergic and had high blood pressure.  (Tr. 906).  Additionally, plaintiff reported that he has seen Dr. Porto since 1994 and he spent "[ninety percent] of his time in his pajamas during the day."  (Tr. 907).  According to plaintiff, he had a "lack of concentration," and due to his "short fuse[,]" he "wouldn't last [ten] minutes before [he] would go tell someone to f-off."  (Id.).  Plaintiff's anxiety "comes in flare-ups."  (Id.).  Dr. Hart opined that plaintiff's limitations from anxiety and depression "would be moderate for persistence," and "[o]ne would expect that with a much simpler job, a routine, repetitive job, a job where he is not involved in any supervision and everything is routine that it would reduce the kind of triggers" that existed in his role as a supervisor.  (Tr. 909).  According to Dr. Hart, plaintiff "still would have some limitations mild to moderate, in terms of his ability to work with and behave normally with coworkers and supervisors."  (Id.).  Dr. Hart

_____

[20]On August 22 and October 8, 2007, plaintiff had blood work drawn at the request of Dr. Mejnartowicz or Meyer.  (See Tr. 180-85, 188-91, 884-87, 890-95).

concluded that "[c]ognitively, [plaintiff was] reasonably intact."  (Id.).[21]

Marsha Hahn, PhD, completed a Psychiatric Review Technique of plaintiff for SSA on March 10, 2008.  (Tr. 936-49).  Dr. Hahn found that plaintiff had the following non-severe impairments: affective disorder characterized by a mood disorder secondary to a medical problem, anxiety-related disorder, and personality disorder characterized by persistent disturbances of mood or affect, and coexisting nonmental impairments. (Tr. 936, 939, 941, 943).   According to Dr. Hahn, plaintiff had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. 946).  Dr. Hahn noted that plaintiff's medical records did not support depressive symptoms, and plaintiff responded well to medication with his mood reactive to his medical problems.  (Tr. 948).  While Dr. Hahn found plaintiff credible regarding his feelings of depression, plaintiff had no cognitive deficits or evidence of reduced concentration, and while plaintiff experienced episodes of anxiety and mild depression secondary to family conflicts and concerns, his adaptive functioning remained grossly intact with no significant functional deficits due to a psychiatric condition. (Id.).

On March 12, 2008, Dr. Luis R. Cruz completed a medical examination of plaintiff for CT DDS.  (Tr. 928-30).  Dr. Cruz did not review plaintiff's medical records, but rather relied on plaintiff for his medical history.  (Tr. 928). Dr. Cruz's physical examination noted that plaintiff appeared in "no acute distress," with a normal gait, without the use of any assistance device, and with no difficulty getting on and off the examining table.  (Id.).  The remainder of Dr. Cruz's physical examination was normal.  (Tr. 929).

Two days later, plaintiff was seen by Dr. Mejnartowicz (Tr. 902-05, 954-57), who

---

[21] Following these records is an unsigned, undated and incomplete Physical Residual Functional Capacity Assessment.  (See Tr. 910-17).

noted that plaintiff has not worked since 2004 as he was "mostly disturbed by chronic fatigue/anxiety/lower back pain" and plaintiff was seeing his psychiatrist, Dr. Stitelman, and a therapist. (Tr. 902, 954). Dr. Mejnartowicz included the same comprehensive list of "[a]ctive [p]roblems." (Id.). He advised plaintiff to continue psychiatric treatment. (Tr. 905, 954). On that same day, Dr. Mejnartowicz completed a "Multiple Impairment Questionnaire" for plaintiff (Tr. 918-25), in which he noted that he has been treating plaintiff since April 24, 2006, approximately twice a year. (Tr. 918). According to Dr. Mejnartowicz, plaintiff exhibited mild tremors, frequent position changes, and an anxious appearance, and his symptoms included daily back pain, fatigue, night sweats, sensitivity to cold, frequent urination, diarrhea, depression, anxiety and panic attacks. (Tr. 918-19). Dr. Mejnartowicz opined that plaintiff's pain fluctuated from a 0-3 out of a scale to ten, and his fatigue fluctuated from a 0-7 out of a scale to ten, though plaintiff was able to completely relieve his pain with medication. (Tr. 920). Additionally, plaintiff could sit for five hours and stand/walk for two hours, both with breaks every fifteen minutes. (Tr. 920-21). Plaintiff could frequently lift and carry up to five pounds but can occasionally lift ten pounds, and could occasionally carry up to twenty pounds, but he could never lift or carry more than that. (Tr. 921). Plaintiff underwent physical therapy and his symptoms would likely increase if he were placed in a competitive environment. (Tr. 922). Plaintiff frequently experienced pain and fatigue severe enough to interfere with attention and concentration, he had emotional factors of anxiety and depression, and his impairments would likely last at least twelve months. (Tr. 923). According to Dr. Mejnartowicz, plaintiff was capable of working in a low stress environment, although he would likely need unscheduled breaks every twenty or thirty minutes in the work day, lasting about fifteen minutes at a time. (Id.). Furthermore, Dr.

Mejnartowicz opined that plaintiff had "good days"and "bad days" and "theoretically" was prone to infection.  (Tr. 924).  Plaintiff would need a job that permitted ready access to a restroom and plaintiff's ability to work would be limited by psychological limitations, a need to avoid fumes, dust, heights and temperature extremes, and no bending.  (Id.).[22]

The next day, on March 15, 2008, Dr. Stitelman submitted a medical source statement to CT DDS on behalf of plaintiff, in which he noted that he met with plaintiff three times since January 10, 2006.  (Tr. 931).  The consultation of this date was about plaintiff continuing Clonazepam.  (Id.).  Plaintiff presented as "a man who had a longstanding anxiety disorder," and plaintiff reported that he realized he cannot work anymore as he is "emotionally burnt out on jobs."  (Id.).

On March 17, 2008, plaintiff's counselor, Dr. Porto, completed paperwork for CT DDS (Tr. 932-35), in which he noted that he has treated plaintiff from May 27, 2005 through March 17, 2008 on at least a monthly basis for psychological problems including panic attacks, depression and anxiety.  (Tr. 932).  According to Dr. Porto, plaintiff was experiencing severe depression and anxiety, was angry at times, and exhibited signs of OCD.  (Tr. 932).  Plaintiff was tired, unenthusiastic, disoriented at times, had no energy and was "very down[,]" had poor concentration and disconnected conversation, had disconnected thought, low-self esteem, depressive, flat, inaudible comments, and very poor judgment and insight.  (Tr. 932-33).  Dr. Porto noted that plaintiff had daily problems with his ability to use good judgment regarding safety and dangerous circumstances, his ability to ask questions or request assistance, and his ability to carry out single-step or multi-step instructions, the frequency of which problems he rated as a one on a scale to five.  (Tr. 933-34).  Dr. Porto

_____

[22]Plaintiff underwent blood work at Dr. Mejnartowicz's request on March 11, 2008.  (Tr. 898-901, 950-53).

also noted problems in plaintiff's ability to care for his personal hygiene and physical needs, respect and respond appropriately to others in authority, and get along with others without distracting them or exhibiting behavioral extremes, which he rated as a two on a scale to five. (Id.). Plaintiff fell at a three on the scale to five in his ability to focus long enough to finish assigned simple activities or tasks and change from one simple task to another. (Tr. 934). Dr. Porto rated plaintiff as a four out of five in his ability to use appropriate coping skills to meet ordinary demands of a work environment and to handle frustration appropriately, and in his ability to perform basic work activities at a reasonable pace or to finish on time. (Tr. 933-34). Additionally, Dr. Porto rated plaintiff as a five out of five in his ability to perform work activity on a sustained basis (i.e., eight hours per day, five days per week). (Tr. 934). Plaintiff had a counseling session with Dr. Porto that same day, in which Dr. Porto noted that he helped plaintiff fill out his forms for disability, and that plaintiff was "[f]eeling down as usual." (Tr. 1035).

On March 19, 2008, nine days after her first Review, Dr. Hahn completed a second Psychiatric Review Technique for plaintiff (Tr. 970-83), in which she noted that plaintiff had affective disorder, characterized as "MDD [major depressive disorder], recurrent, unspecified." (Tr. 973). In this Review, Dr. Hahn changed her assessment of plaintiff's degree of limitation from mild to moderate difficulty in maintaining concentration, persistence or pace; she kept her assessment regarding plaintiff's restriction of activities of daily living and difficulties in maintaining social functioning as mild, with no episodes of decompensation. (Tr. 980). Dr. Hahn reviewed the new assessments of Drs. Stitelman and Porto, and the new medical evidence; after considering these new assessments, Dr. Hahn amended her Review to note that plaintiff "appears to struggle with recurring anxiety and depression [symptoms]

including reduced concentration and task persistence." (Tr. 982).

Dr. Hahn then completed a Mental Residual Functional Capacity Assessment (Tr. 984-87), in which she found plaintiff moderately limited in his ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or proximity to others without being distracted by them. (Tr. 984). Plaintiff was not significantly limited in any of the other categories. (Tr. 984-85). Dr. Hahn noted that plaintiff had episodes of reduced concentration, "primarily when anxious over health issues, [that] may occasionally disrupt his ability to perform more complex work." (Tr. 986). Dr. Hahn continued that although plaintiff's concentration may be reduced at times, plaintiff was capable of performing task persistence for up to two hour periods, requiring rest breaks, and "generally [he was] able to complete tasks at his own rate and pace," could travel, could set realistic work goals, and could adjust to changes in work duties and schedule. (Id.).

On March 26, 2008, John Cowan of CT DDS completed a Report of Contact, in which he noted that plaintiff's physical conditions were evaluated and were considered non-severe. (Tr. 156). Cowan noted that the plaintiff's "psychiatric problems [would] moderately effect the ability to concentrate for [a] period exceeding [two] hours and [would] reduce the capacity to complete complex or detailed tasks," and plaintiff "[would] be unable to meet the demands of his past skilled work due to the aforementioned [psychiatric] restrictions. He could be expected to engage in other (less complex) jobs at any level of exertion." (Id.).[23] On that day, Dr. Joseph Connolly, Jr. completed a Case Analysis of plaintiff, in which he concluded that plaintiff's impairments were non-severe as plaintiff had successful treatment

---

[23]On that same day, plaintiff underwent an ophthalmology exam. (Tr. 958-59).

of his hepatitis C and Waldenstrom's, he had benign essential hypertension, and his comprehensive examination was normal. (Tr. 988).

Plaintiff was seen by Dr. Fynan on April 10, 2008, during which appointment Dr. Fynan noted that plaintiff's hepatitis C was "cured" and plaintiff had been "feeling well over the past six months and ha[d] no specific complaints today." (Tr. 966-67). Dr. Fynan noted that there has been "a very slow, but steady rise in his paraprotein[,]" such that he would continue to monitor plaintiff and if there was an increase again, plaintiff may need to go "back on salvage therapy with Rituxan." (Tr. 967).[24]

Dr. Maria Lorenzo, an internist, completed a Case Analysis of plaintiff for SSA in June 10, 2008, in which she concluded that plaintiff's hypertension was "[s]table and controlled[,]" and thus was non-severe; his Waldenstrom's Macroglobulinemia was non-severe, and his hepatitis C, which has been treated and from which treatment plaintiff now had an undetectable viral load, was non-severe. (Tr. 991). Six days later, Dr. Porto completed a second form on plaintiff's behalf, in which he noted that there had been no improvement in plaintiff's condition since his treatment began in May 2005. (Tr. 992-93). Much of Dr. Porto's assessment was duplicative of his earlier report of March 17, 2008. (Tr. 933-35). However, Dr. Porto increased his rating of plaintiff's abilities -- he noted that plaintiff's ability to care for his personal hygiene and physical needs was now rated as a three on a scale to five (Tr. 993); Dr. Porto rated plaintiff a two in his ability to ask questions or request assistance and carry out single-step instructions (Tr. 994); and he rated plaintiff as a three in his ability to carry out multi-step instructions, change from one simple task to another, or perform basic work activities at a reasonable pace or to finish on time. (Id.). As before,

---

[24]On April 2 and 22, 2008, plaintiff underwent blood work at the request of Dr. Mejnartowicz and Meyer. (Tr. 960-65, 968).

Dr. Porto rated plaintiff as a four out of five in his ability to use appropriate coping skills to meet ordinary demands of a work environment and to handle frustration appropriately, and in his ability to perform basic work activities at a reasonable pace or to finish on time; however, he also rated plaintiff as a four in his ability to use good judgment, interact appropriately with others, respect or respond appropriately to others in authority, get along with others, and focus to finish assigned simple activities. (Tr. 993-94). Additionally, Dr. Porto changed his rating of plaintiff from a five to a four in his ability to perform work activity on a sustained basis (i.e., eight hours per day, five days per week). (Tr. 994).

Three months later, on June 16, 2008, plaintiff saw Dr. Porto, during which session he was "[f]eeling very down[,]" with complaints of tiredness and lack of enthusiasm. (Tr. 1037). Plaintiff felt "very unreasonable"; he "was not doing much in the way of exercising"; he did not "respond positively to words of encouragement"; and he did not understand that every decision results in a consequence, good or bad. (Id.).

On June 25, 2008, Janet Jachimowski of CT DDS completed a Report of Contact, in which she noted that after a state agency M.D. reviewed plaintiff's file, it was determined that the plaintiff's physical symptoms were non-severe but that he did have a severe psychiatric impairment. (See Tr. 163; see also Tr. 989). Plaintiff was not able to "understand, remember or carry out detailed instructions" but he "[was] able to carry out very short and simple instructions intrinsic to unskilled work." (Tr. 163). "[Plaintiff's] symptoms [could] also cause him to have problems working in coordination with or proximity to others." (Id.). Additionally, "[plaintiff was] able to work without special supervision, maintain regular attendance, ask questions and request assistance when needed." (Id.). He was "able to be aware of hazards and can travel independently." (Id.). Jachimowski

concluded that plaintiff "[could not] perform past work," that he "would be expected to make a vocational adjustment to other work[,]" and that he "[could] perform unskilled jobs at any exertional level." (Id.).

On that same day, Christopher Leveille, PsyD completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique of plaintiff for SSA. (Tr. 998-1015). Dr. Leveille found plaintiff moderately limited in his ability to understand, remember and carry out detailed instructions, in his ability to work in coordination with or proximity to others without being distracted by them, and in his ability to complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 998-99). Dr. Leveille found plaintiff "not significantly limited" in any of the other categories. (Id.). According to Dr. Leveille, plaintiff could have difficulty performing more complex multi-step tasks as his pace was slowed by his mood symptoms, but he could perform simple repetitive tasks, could relate adequately with the public, coworkers and supervisors, and could adapt appropriately to basic changes, though he does have a reduced stress tolerance. (Tr. 1000).

Dr. Leveille opined that plaintiff fell within the affective disorder listing characterized by sleep disturbance, difficulty concentrating, and MDD. (Tr. 1005). Plaintiff had mild restrictions in his activities of daily living and in difficulties maintaining social functioning, and had moderate difficulties maintaining concentration, persistence or pace, although he had no episodes of decompensation. (Tr. 1012). According to Dr. Leveille, plaintiff was credible for his allegations of depression although he was laid off from work, rather than stopped working due to psychiatric function, and he was fully functional with respect to his ADLs and was cooperative. (Tr. 1014). Dr. Leveille concluded that while plaintiff's "characterological

deficits [were] of consideration and likely affect[ed] mood and relational disruptions, . . . this ha[d] apparently never been of grave significance in the work context." (Id.).

Dr. Porto completed a Psychiatric/Psychological Impairment Questionnaire on March 17, 2009 (Tr. 1016-23), in which he reported that he has treated plaintiff since May 27, 2005 to that time on a weekly basis and as needed for plaintiff's recurrent depression. (Tr. 1016, 1037). Dr. Porto assigned plaintiff a GAF of 35 and gave him a fair to poor prognosis. (Tr. 1016).[25] According to Dr. Porto, his clinical findings are supported by plaintiff's mood disturbance, social withdrawal or isolation, decreased energy, obsessions or compulsions, generalized persistent anxiety and hostility or irritability. (Tr. 1017). Plaintiff exhibits symptoms of chronic anxiety, depression, and lack of energy and motivation. (Tr. 1018). Dr. Porto found plaintiff to be mildly limited in his ability to understand, remember and carry out one or two step instructions, and moderately limited in his ability to remember locations and work-like procedures, carry out detailed instructions, sustain an ordinary routine without supervision, interact appropriately with the general public, and be aware of normal hazards and take appropriate precautions. (Tr. 1019-21). Additionally, he found plaintiff markedly limited in his ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, work in coordination with or proximity to others without being distracted, complete a normal work week, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers, maintain socially appropriate behavior, respond appropriately to changes in the work setting, travel to unfamiliar places or use public transportation, and set realistic

---

[25]A GAF of 31 to 40 indicates the individual has an "impairment in reality testing or communication . . . [or] [a] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV at 32.

goals or make plans independently. (Tr. 1019-21). Dr. Porto emphasized that plaintiff's "[a]bility to work outside his home" is "markedly limited[,]" he is likely to be absent more than three times a month, and he is incapable of even "low stress" work as he is "[v]ery intolerant of opinions different from his." (Tr. 1021-23).

On August 19, 2009, a hearing was held before ALJ Horton, at which plaintiff and Dr. Norman F. Baldwin, a psychologist serving as a medical expert testified. (See Tr. 18-42, 84-86). Plaintiff testified that after being diagnosed with Waldenstrom's in 1998, plaintiff continued to work with special accommodations, including being relieved of performing "the pull[ing], climbing portions and the heavy lifting[,]" and his employer also let him stay out of work for his chemotherapy treatments. (Tr. 24-25). Since 2004, plaintiff has been supporting himself from his wife's employment, benefits provided by his prior employer, his savings and his IRA assets. (Tr. 31-32). He was placed on layoff status and received about six months of pay. (Tr. 31). He also received vacation pay, and a bonus earned in a prior year. (Tr. 31-32). Plaintiff testified about having depleted his savings, which had been approximately $100,000, around 2004 or 2005. (Tr. 31-32). He splits the household bills with his wife. (Tr. 32). He takes a periodic equal withdrawal from his IRA account in the amount of $2,500 a month. (Tr. 32). Plaintiff does not have a pension from his job. (Tr. 32).

Plaintiff complains of fatigue and lack of stamina as a result of the Waldenstrom's, and intestinal problems as a result of the chemotherapy. (Tr. 25). More specifically, plaintiff claims after he walks for fifteen minutes, he is tired and needs to sit but his back hurts when he sits. (Id.). That said, however, plaintiff also testified that he spends his day watching television, stock trading on his computer, making toast or getting a drink from his kitchen,

going to the bathroom and drying his sweat. (Tr. 26). Plaintiff testified that he needs to use the bathroom every twenty minutes to a half hour, going to the facility approximately three to four times an hour for urination. (Tr. 26). He also experiences diarrhea daily, and sometimes multiple times a day. (Tr. 26-27). After twenty minutes of sitting down, plaintiff uses a hair dryer to dry his sweat; he particularly sweats on his lower back. (Tr. 26). Furthermore, plaintiff reported that he could stay seated comfortable for about twenty minutes and then he would have back pain, would have to urinate, or would be so jittery he would have to get up and go for a walk. (Tr. 27).

Plaintiff claims that his depression affects him in several ways; he testified about a lack of caring about anything, he does not go on vacation, he does not get excited about seeing relatives, he does not care about birthdays or Christmas, and he does not find Christmas, Thanksgiving or the above activities to be fun. (Tr. 27-28). Moreover, plaintiff suffers from irritability such that he will lose his patience after a short period of time. (Tr. 28). For example, if his wife asks him a question he will answer it nicely the first time, snap the second time she repeats the question, and might get into a fight where he becomes more and more angry if she repeats the question a third time. (Id.). Additionally, plaintiff testified that he does not have much interaction with the general public, but when he does, he can be confrontational "if someone wants to be confrontational with [him]." (Id.). Plaintiff also testified having many different types of anxiety and notes that he thinks some may be related to types of OCD. (Tr. 29). Furthermore, plaintiff complains that his depression affects his concentration; he gets distracted and he cries about once or twice a week over different issues, more often during the height of his problems. (Id.). Plaintiff has had martial problems and family issues with his children. (Id.).

Plaintiff complains of side effects from some of his medications. (See Tr. 30, 167). Oxybutynin Chloride gives plaintiff a severe dry mouth and makes his mind cloudy. (Tr. 30). According to plaintiff, Hyzaar made plaintiff's frequent urination problem worse as it contains a diuretic. (Id.). Sertraline or Zoloft makes the plaintiff weak and tired but helps plaintiff to be more coherent and put thoughts together. (Id.).

Plaintiff testified that he is in remission from the Waldenstrom's and is rechecked every six months. (Tr. 32). However, he reports that he still has effects even when he is in remission; he still experiences fatigue and stamina problems, and he is anemic. (Tr. 31-32).

Dr. Baldwin, the medical expert, questioned plaintiff about his stock trading in response to which plaintiff testified that he focuses on investing approximately five minutes at a time, for a total of one hour per day. (Tr. 34-35). Having reviewed Dr. Stitelman's records along with Dr. Porto's report of March 2009, Dr. Baldwin testified that plaintiff "certainly seems to present with the criteria for a major depressive disorder with features of anxiety . . . consistent with a listing level 12.04." (Tr. 36-37).[26] However, Dr. Baldwin

---

[26]Listing 12.04 provides:

Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or

continued that simply relying on "the check-offs," rather than on Dr. Porto's treatment notes, and considering that in relation to Dr. Hart's independent evaluation of plaintiff, "it would be desirable to see Dr. Porto's progress notes, which I don't see, or some other narrative report from Dr. Porto who has worked with the claimant since 2005." (Tr. 37-38). According to Dr. Baldwin, an individual who has a GAF score of 35 "generally would be hospitalized at that level, or close to it." (Tr. 39). Dr. Baldwin opined that it "appears from what I can see that when talking with the claimant, one wouldn't immediately sense that there was . . . an issue with a depressive disorder, but that it comes out more behaviorally." (Id.). Based on the differences in Dr. Porto's conclusions and Dr. Hart's conclusions, Dr. Baldwin "question[ed] the 35 GAF." (Tr. 39-40). The ALJ then remarked:

> Well, it seems to me that without Dr. Porto's actual treatment records, and whether this is a new problem, an old problem, been going on since 2004 on a consistent basis, whether he's compliant with treatment, whether there's - -- I don't, there's nothing here. And what is here doesn't seem to be consistent. And I'm just wondering whether we can just hold the record open in order to get the full file because just checking off numbers gives me

d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking; or
. . .

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace ; or
4. Repeated episodes of decompensation, each of extended duration . . .

20 C.F.R. Pt. 404, Subpt. P. App. 1 § 12.04.

nothing.  And I need evidence.

(Tr. 40).

Plaintiff added that he last saw Dr. Porto a "couple of months ago or it may have been six months ago and I don't think he was helping me any further and I pretty much stopped seeing him." (Tr. 40).   The ALJ then concluded that she did not "think [there was] any point in really going further with Dr. Baldwin's testimony until we actually have some treatment notes."  (Tr. 41).   On August 26, 2009, exactly one week after the hearing, plaintiff's counsel forwarded copies of Dr. Porter's thirteen pages of notes to ALJ Horton.  (Tr. 1024-37).

## III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize

the entire record to determine the reasonableness of the ALJ's factual findings.  See id.
Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence
and should be upheld even in those cases where the reviewing court might have found
otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d
Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to
disability insurance benefits.  See  42 U.S.C. § 423(a)(1).  "Disability" is defined as an
"inability to engage in any substantial gainful activity by reason of a medically determinable
physical or mental impairment which can be expected . . . to last for a continuous period of
not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20
C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.
See 20 C.F.R. § 404.1520(a).  If the claimant is currently employed, the claim is denied.  See
20 C.F.R. § 404.1520(b).  If the claimant is not working, as a second step, the ALJ must
make a finding as to the existence of a severe mental or physical impairment; if none exists,
the claim is also denied.  See 20 C.F.R. § 404.1520(c).  If the claimant is found to have a
severe impairment, the third step is to compare the claimant's impairment with those in
Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(d); Bowen v.
Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment
meets or equals one of the impairments in the Listings, the claimant is automatically
considered disabled.  See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80.  If the
claimant's impairment does not meet or equal one of the listed impairments, as a fourth step,
he will have to show that he cannot perform his former work.  See 20 C.F.R. § 404.1520(e).

If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. <u>See Balsamo</u>, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. <u>See</u> 20 C.F.R. § 404.1520(f); <u>see also Balsamo</u>, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using the Medical-Vocational Guidelines ["the Grid"]. The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled. <u>See</u> 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations). A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered. <u>See</u> 20 C.F.R. § 200.00(e)(2). If the Grid cannot be used, <u>i.e.</u>, when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity. <u>See Pratts v. Chater</u>, 94 F.3d 34, 39 (2d Cir. 1996)(<u>citing Bapp v. Bowen</u>, 802 F.2d 601, 604-05 (2d Cir. 1986)).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Horton found that plaintiff has not engaged in any substantial gainful activity since February 11, 2004.  (Tr. 9; <u>see</u> 20 C.F.R. § 404.1520(a) & (b)).  ALJ Horton then concluded that the medical evidence supports a finding that the claimant's depression and anxiety are severe impairments.  (Tr. 10-11; <u>see</u> 20 C.F.R. § 404.1520(c)).  In the third step of the evaluation process, ALJ Horton concluded that although plaintiff's impairments are "severe," plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 11-12).  In addition, at step four, ALJ Horton found that plaintiff has the residual functional capacity to perform a full range of unskilled work at all exertional levels.  (Tr. 12-16).  According to the ALJ, plaintiff is moderately limited in his ability to carry out more complex instructions but is able to understand, perform and carry out simple instructions in an ordinary work setting under routine levels of supervision; sustain task persistence for up to two hours at a time; ask relevant questions; ask for help when necessary; and adjust to ordinary changes in work duties and schedules.  (<u>Id.</u>). Further, ALJ Horton concluded that plaintiff is unable to perform any past relevant work, although considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers that plaintiff can perform.  (Tr. 16-17).  Accordingly, the ALJ found that plaintiff has not been under a disability from February 11, 2004 through the date of her decision.  (Tr. 17).

Plaintiff seeks judgment on the pleadings on grounds that the ALJ failed to properly consider plaintiff's severe impairments, including his von Willebrand disease, hepatitis C, anemia, Waldenstrom's macroglobulinemia, and low back pain (Dkt. #8, Brief at 15-17);

plaintiff is per se disabled under Medical Listing § 12.04 and the ALJ failed to have the medical expert review Dr. Porto's records in an effort to explain a discrepancy between Dr. Porto's assignment of a GAF of 35 and the findings of Dr. Hart (id. at 17-20); the ALJ failed to follow the treating physician rule in assigning "little weight" to Dr. Porto's opinion (id. at 21-25); the ALJ failed to properly evaluate plaintiff's credibility (id. at 25-28); and the ALJ erred by using the Medical-Vocational Guidelines (id. at 28-29). (See also Dkt. #13).

Defendant contends that substantial evidence supports the ALJ's assessment of plaintiff's severe impairments at step two of the disability evaluation process (Dkt. #12, Brief at 22-27); substantial evidence supports the ALJ's assignment of relative weight to the various medical opinions in the record (id. at 27-38); substantial evidence supports the ALJ's assessment of plaintiff's credibility (id. at 38-39); and the ALJ properly relied on the Grids at step five to find plaintiff not disabled. (Id. at 39-40).

A. SEVERE IMPAIRMENTS

ALJ Horton found that plaintiff's depression and anxiety were "severe impairments," but none of plaintiff's various physical ailments were "severe." (Tr. 10-11). For a claimant to establish that he suffers from a severe impairment or combination of impairments, a claimant must show more than the mere existence of a condition or ailment. See Bowen v. Yuckert, 482 U.S. 137, 153 (1987). Plaintiff must show that an impairment would have more than a minimal effect on his ability to do basic work activities; the impairment must "significantly limit[ ] [plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). While a "de minimis" showing is all that is needed to establish the severity of a claimant's impairment, a showing must still be made. Bowen, 482 U.S. at 153.

While plaintiff contends that the ALJ failed to properly consider plaintiff's von

Willebrand disease, hepatitis C, anemia, Waldenstrom's macroglobulinemia and low back pain, plaintiff focuses his specific arguments only on the latter two impairments. (See Dkt. #8, Brief at 15-17). Plaintiff's medical records document his treatments with Rituxan for his Waldenstrom's macroglobulinemia in 2003, 2004, 2005 and 2006, during which time plaintiff was noted to be "feeling well" or "feeling very well" (Tr. 465, 470, 482, 693, 733), "doing well" (Tr. 694), and "look[ing] generally well." (Tr. 370, 749). In October 2007, Dr. Fynan noted that plaintiff had "been doing very well over the summer and early fall with no major medical issues." (Tr. 178-79, 896-97). Dr. Fynan reviewed plaintiff's systems and reported no fevers, no night sweats, no bruising or bleeding, and no adenopathy, and plaintiff's weight was stable. (Id.). Dr. Fynan noted that plaintiff had been in remission from his Waldenstrom's macroglobulinemia two years and four months after completing therapy in 2006; plaintiff's anemia was mild and had improved from the summer; and plaintiff's secondary von Willebrand's disease was in remission as was his hepatitis C. (Id.).

In February 2007, Dr. Mejnartowicz's notes reflect that plaintiff had loose stools precipitated by a twenty-four-hour bug. (Tr. 220, 680). In his March 14, 2008 report, Dr. Mejnartowicz noted, for the first time, that plaintiff is "mostly disturbed by chronic fatigue/anxiety/lower back pain," he has night sweats, he has "chronic 'diarrhea,'" described as "looser not very frequent stools," and he has heat and cold intolerance (Tr. 902-04, 954-57); Dr. Mejnartowicz completed an eight-page "Multiple Impairment Questionnaire" for the SSA that same day. (Tr. 918-25). These symptoms, with the limited exception of the stomach bug in February 2007 referenced above, were not noted elsewhere in Dr. Mejnartowicz's treatment records.[27] In light of the inconsistency of his records, the ALJ's

_____

[27]As stated earlier, in October 2007, Dr. Fynan reported no fevers, no night sweats, no bruising or bleeding, and no adenopathy, and plaintiff's weight was stable. (Tr. 178-79, 196-97).

decision to "find more candor and credibility" in Dr. Mejnartowicz's contemporaneous treatment notes, is supported substantial evidence in the record. (Tr. 13-14).

After starting his antiviral treatment for his hepatitis, in November 2006 plaintiff initially reported mild nausea, and feeling tired the first two days after his shot, but "[o]ther than that, he [was] doing well[,]" with a good appetite, mood and concentration. (Tr. 264, 523). Shortly thereafter, in February 2007, plaintiff reported "minor weakness" (Tr. 229, 671), but two months later, in April 2007, Dr. Fynan noted that plaintiff's hepatitis C was "apparently in remission," and plaintiff confirmed that his "fatigue and muscle aches have resolved" and he was feeling well. (Tr. 201-02, 872-73). The next year, in April 2008, Dr. Fynan noted that plaintiff's hepatitis C was "cured," and plaintiff had been "feeling well over the past six months and he has no specific complaints today." (Tr. 966).

Plaintiff's anemia is noted throughout the record, but never as a disabling condition. In December 2006, Eggers noted that plaintiff was symptomatic with anemia (Tr. 640-41); in February 2007, Eggers noted that plaintiff was continuing to "experience anemia and [was] symptomatic"(Tr. 229-30, 671-72); and in April 2007, Dr. Fynan noted that he would continue to check on plaintiff's anemia which was a side effect of plaintiff's treatment for his hepatitis C. (Tr. 201-02, 872-73). By October 2007, six months before Dr. Fynan characterized plaintiff's hepatitis as "cured," Dr. Fynan described plaintiff's anemia as "mild." (Tr. 178-79, 896-97). Similarly, there are no medical records supporting severe low back pain, nor are there objective diagnostics studies, X-rays, MRIs or clinical tests to that effect.[28]

In light of the foregoing, plaintiff has not satisfied his burden of establishing that any

---

[28]When plaintiff reported to Dr. Porto in January 2007 that he was "feeling weak," Dr. Porto responded that plaintiff "needs to . . . get a job and socialize with others." (Tr. 1036).

of these physical impairments, individually or in combination, would "significantly limit[ ] [plaintiff's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c). Accordingly, the ALJ did not err in her conclusion that these physical impairments are non-severe.

<u>B. LISTING 12.04/TREATING PHYSICIAN RULE/MEDICAL EXPERT</u>

As previously indicated, plaintiff argues that he is <u>per se</u> disabled under Medical Listing § 12.04[29] and the ALJ failed to have the medical expert review Dr. Porto's records in an effort to explain a discrepancy between Dr. Porto's assignment of a GAF of 35 and the findings of Dr. Hart (Dkt. #8, Brief, at 17-20), and the ALJ failed to follow the treating physician rule in assigning "little weight" to Dr. Porto's opinion (<u>id.</u> at 21-25).   In reaching her conclusion that plaintiff does not meet or medically equal the criteria of Listing 12.04,[30] the ALJ relied on Dr. Hart's findings that plaintiff has mild restrictions in his activities of daily living and in his social functioning, moderate difficulties regarding his concentration, persistence and pace, and no episodes of decompensation. (Tr. 11). ALJ Horton acknowledged Dr. Porto's treatment notes and the three consulting opinions provided to SSA, but discredited Dr. Porto's opinions on grounds that they were inconsistent with his contemporaneous treatment notes which were "fairly benign" and reflect "recitation[s] of the session[s]."  (Tr. 15).  The ALJ considered Dr. Porto's records and concluded that his opinions "are given little weight because his treatment notes do not support the significant restrictions assigned in the Questionnaires." (<u>Id.</u>).

In this case, Dr. Porto's thirteen pages of contemporaneous treatment notes, which

---

[29]<u>See</u> note 26 <u>supra</u>.

[30]ALJ Horton also considered whether plaintiff's mental impairments meet or medically equal the criteria of Listing 12.06.  (Tr. 11).

span from May 2005 through March 2009 (Tr. 1025-37), fall into three discrete time periods. The eleven pages of early notes, from May 2005 through January 2007 (Tr. 1025-1034, 1036) reflect that the subject of his counseling sessions with plaintiff was predominantly plaintiff's marital and family issues. There are few entries in Dr. Porto's notes that reflect plaintiff's symptoms. In April 2006, plaintiff reported to Dr. Porto that Dr. Stitelman, his psychiatrist, "strongly recommended that [plaintiff] not [take the Interferon] treatment as severe depression usually occurs," yet after starting the treatment, Dr. Porto noted that plaintiff reported that "even his guitar playing [was] reflecting his more relaxed and focused thinking." (Tr. 1031-32). While plaintiff continued to see Dr. Porto to discuss, as was reflected in Dr. Porto's notes, plaintiff's relationship with his wife and family, his APRN, Carol Eggers noted in November 2006 that plaintiff's depression was "currently stable." (Tr. 266, 273, 525). A month later, Eggers noted that plaintiff "may be depressed" in that he indicated that he had no energy or desire to do anything, although "he denie[d] any signs or symptoms of depression." (Tr. 640-41). On January 10, 2007, Dr. Porto opined that plaintiff "needs to . . . get a job and socialize with others." (Tr. 1036).

Plaintiff did not seek treatment from Dr. Porto from January 2007 until February 2008, which clearly is suggestive of plaintiff not experiencing any significant psychiatric problems during that time frame. From February 2008 through March 2009, plaintiff returned to Dr. Porto, who was actively involved in completing paperwork for plaintiff's disability application; Dr. Porto noted that plaintiff started his application for disability benefits, and his two pages of treatment notes then began to include references to plaintiff's emotional state rather than just recitations of plaintiff's discussions about his family. (Tr. 1035, 1037). At his February 21, 2008 appointment with plaintiff, Dr. Porto noted that

plaintiff is content staying home and is "miserable emotionally." (Id.). Two weeks later, on March 4, 2008, Dr. Porto noted that plaintiff was "feeling down" and had no energy. (Id.). Two weeks thereafter, on March 17, 2008, Dr. Porto completed forms for SSA, and in his treatment notes bearing the same date, he noted that plaintiff was feeling down "as usual." (Id.; see also Tr. 932-35). Similarly, in treatment notes dated June 16, 2008, Dr. Porto completed additional paperwork for SSA and noted that plaintiff was "[f]eeling very down," with complaints of tiredness and lack of enthusiasm, he was "very unreasonable," did not "respond positively to words of encouragement," and did not understand that every decision results in a consequence. (Tr. 1037; see also Tr. 992-96). At the last session, on March 17, 2009, Dr. Porto completed additional paperwork for plaintiff's Social Security application, and the doctor noted that plaintiff was exclusively involved in assisting his wife who had knee surgery one week earlier, with no mention of plaintiff's emotional state. (Id.. see also Tr. 1016-23). In his observations at these five additional sessions, at three of which Dr. Porto completed assessments for plaintiff's application for benefits, Dr. Porto made no assessment regarding plaintiff's work capacity.

As previously indicated, Dr. Porto provided opinions for CT DDS on March 17, 2008, June 16, 2008, and March 17, 2009. (Tr. 932-35, 992-93, 1016-23). In his March 17, 2008 report, Dr. Porto described plaintiff as suffering from panic attacks, depression and anxiety; he was experiencing severe depression and anxiety, was angry at times, and exhibited signs of OCD; he was tired, unenthusiastic, disoriented at times, had no energy and was "very down[,]" had poor concentration and disconnected conversation, had disconnected thought, low-self esteem, depressive, flat, inaudible comments, and very poor judgment and insight. (Tr. 932-33). Dr. Porto noted that plaintiff had daily problems with his ability to use good

judgment regarding safety and dangerous circumstances, his ability to ask questions or request assistance, and his ability to carry out single-step or multi-step instructions, the frequency of which problems he rated as a one on a scale to five. (Tr. 933-34). Dr. Porto also noted problems in plaintiff's ability to care for his personal hygiene and physical needs, respect and respond appropriately to others in authority, and get along with others without distracting them or exhibiting behavioral extremes, which he rated as a two on a scale to five. (Id.). Plaintiff fell at a three on the scale to five in his ability to focus long enough to finish assigned simple activities or tasks and change from one simple task to another. (Tr. 934). Dr. Porto rated plaintiff as a four out of five in his ability to use appropriate coping skills to meet ordinary demands of a work environment and to handle frustration appropriately, and in his ability to perform basic work activities at a reasonable pace or to finish on time. (Tr. 933-34). Additionally, Dr. Porto rated plaintiff as a five out of five in his ability to perform work activity on a sustained basis (i.e., eight hours per day, five days per week). (Tr. 934).

On June 16, 2008, Dr. Porto completed a second assessment of plaintiff that was largely duplicative of his March 17, 2008 report; however he increased his ratings to reflect more severe limitations in plaintiff's ability to care for his personal hygiene and physical needs, ask for assistance, and carry out multi-stop instructions, change from one simple task to another, and perform basic work activities at a reasonable pace. (Tr. 993-94). Lastly, on March 17, 2009, after a nine-month hiatus since June 2008, Dr. Porto assigned plaintiff a GAF of 35 and opined that plaintiff is mildly limited in his ability to understand, remember and carry out one or two step instructions; moderately limited in his ability to remember locations and work-like procedures, carry out detailed instructions, sustain an ordinary

routine without supervision, interact appropriately with the general public, and be aware of normal hazards and take appropriate precautions; but markedly limited in his ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, work in coordination with or proximity to others without being distracted, complete a normal work week, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers, maintain socially appropriate behavior, respond appropriately to changes in the work setting, travel to unfamiliar places or use public transportation, and set realistic goals or make plans independently.  (Tr. 1019-21).  Dr. Porto emphasized that plaintiff's ability to work outside his home is markedly limited, he is likely to be absent more than three times a month, and he is incapable of even "low stress" work as he is "[v]ery intolerant of opinions different from his."  (Tr. 1021-23).

Dr. Porto's notes and reports from February 2008 through March 2009 were at variance with three consultative reports prepared for SSA in March 2008 through June 2008.  After Dr. Hart's examination on March 10, 2008 for CT DDS (Tr. 906-09), he opined that plaintiff's limitations from anxiety and depression "would be moderate for persistence," and "[o]ne would expect that with a much simpler job, a routine, repetitive job, a job where he is not involved in any supervision and everything is routine that it would reduce the kind of triggers" that existed in his role as a supervisor.  (Tr. 909).  According to Dr. Hart, plaintiff would still have some limitations "mild to moderate, in terms of his ability to work with and behave normally with coworkers and supervisors."  (Id.).  Dr. Hart concluded that "[c]ognitively, [plaintiff was]  reasonably intact."  (Id.).

Similarly, after reviewing plaintiff's medical records, Dr. Hahn, who completed a

Psychiatric Review Technique (Tr. 936-49) regarding plaintiff for SSA on March 10, 2008, opined that plaintiff had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 946). Dr. Hahn noted that plaintiff's medical records did not support depressive symptoms, and plaintiff responded well to medication with his mood reactive to his medical problems. (Tr. 948). While Dr. Hahn found plaintiff credible regarding his feelings of depression, plaintiff had no cognitive deficits or evidence of reduced concentration, and while plaintiff experienced episodes of anxiety and mild depression secondary to family conflicts and concerns, his adaptive functioning remained grossly intact with no significant functional deficits due to a psychiatric condition. (Id.). On March 19, 2008, nine days after her first Review, and after she reviewed new assessments of Drs. Stitelman and Porto, Dr. Hahn completed a second Psychiatric Review Technique (Tr. 970-83), regarding plaintiff in which she increased her assessment of plaintiff's degree of limitation from mild to moderate difficulty in maintaining concentration, persistence or pace; she kept her assessment regarding plaintiff's restriction of activities of daily living and difficulties in maintaining social functioning as mild, with no episodes of decompensation. (Tr. 980). Dr. Hahn then completed a Mental Residual Functional Capacity Assessment (Tr. 984-87), in which she found plaintiff moderately limited in his ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or proximity to others without being distracted by them. (Tr. 984). Dr. Hahn noted that plaintiff had episodes of reduced concentration, "primarily when anxious over health issues, [that] may occasionally disrupt his ability to perform more complex work." (Tr. 986). Dr. Hahn continued that although

plaintiff's concentration may be reduced at times,  plaintiff was capable of performing task persistence for up to two hour periods, requiring rest breaks, and "generally [he was] able to complete tasks at his own rate and pace[,]" could travel, could set realistic work goals, and could adjust to changes in work duties and schedule.  (Id.).

On June 25, 2008, Dr. Leveille completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique (Tr. 998-1015) of plaintiff for SSA in which, like Dr. Hahn, he found plaintiff moderately limited in his ability to understand, remember and carry out detailed instructions, in his ability to work in coordination with or proximity to others without being distracted by them, and in his ability to complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 998-99).   According to Dr. Leveille, plaintiff could have difficulty performing more complex multi-step tasks as his pace was slowed by his mood symptoms, but he could perform simple repetitive tasks, could relate adequately with the public, coworkers and supervisors, and could adapt appropriately to basic changes, though he did have a reduced stress tolerance.  (Tr. 1000).  Additionally, consistent with the foregoing opinions, he concluded that plaintiff had mild restrictions in his activities of daily living and in difficulties maintaining social functioning, and had moderate difficulties maintaining concentration, persistence or pace, although he had no episodes of decompensation.  (Tr. 1012).

The ALJ considered Dr. Porto's records and concluded that his opinions "are given little weight because his treatment notes do not support the significant restrictions assigned in the Questionnaires." (Tr. 15). The ALJ's conclusion is in accord with the Second Circuit's treating physician's rule which states that "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(citations omitted); see 20 C.F.R. 404.1527(d)(2)(when the ALJ "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence,. . . [the ALJ] will give it controlling weight."). In this case, Dr. Porto's opinion, was not consistent with his own treatment notes, nor was it consistent with the other substantial evidence in the record, particularly given the "check-off" format of his opinions. See Kennedy v. Astrue, 343 Fed. Appx. 719, 721 (2d Cir. 2009)(the ALJ properly declined to give controlling weight to a treating physician's opinion in check-off form when such opinion was not corroborated by contemporaneous treatment notes). Had Dr. Porto addressed this issue in his five additional sessions with plaintiff, there might have been a different result here.

The opinions of the state agency medical and psychological consultants were supported by substantial evidence of record. "State agency medical and psychological consultants . . . are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation," 20 C.F.R. § 404.1527(f), and as the Second Circuit had held, the opinions of non-examining sources can override the treating sources' opinions provided they are supported by evidence in the record. Schisler v. Sullivan, 3 F.3d 563, 567

(2d Cir. 1993). [31]

---

[31]Despite this conclusion, the Court remains troubled by the manner in which the ALJ denied the medical expert access to the key medical evidence here, and then discarded his testimony as incomplete. As discussed above, Dr. Baldwin testified at plaintiff's hearing as a medical expert (Tr. 33-42), and at the beginning of his testimony, he indicated that he previously had reviewed Dr. Stitelman's records and Dr. Porto's March 2009 report. (Tr. 36). Based on Dr. Baldwin's review of Dr. Porto's March 2009 report, Dr. Baldwin noted that plaintiff "certainly seems to present with the criteria for a major depressive disorder with features of anxiety . . . consistent with a listing level 12.04." (Tr. 37). Dr. Baldwin continued that simply relying on "the check-offs," rather than on Dr. Porto's treatment notes, and considering that in relation to Dr. Hart's independent evaluation of plaintiff, "[i]t . . . would be desirable to see Dr. Porto's progress notes, which I don't see, or some other narrative report from Dr. Porto who has worked with the claimant since 2005." (Tr. 37-38). Dr. Baldwin noted the inconsistency between the GAF score of 35, which "generally would be hospitalized at that level, or close to it[,]" the differences in Dr. Porto's conclusions and Dr. Hart's conclusions, and his own assessment of plaintiff during the hearing, which was that "when talking with the claimant, one wouldn't immediately sense that there was an, an issue with a depressive disorder, but that it comes out more behaviorally." (Tr. 39). Accordingly, the ALJ then remarked:

>     Well, it seems to me that without Dr. Porto's actual treatment records, and whether this is a new problem, an old problem, been going on since 2004 on a consistent basis, whether he's compliant with treatment, whether there's - - I don't, there's nothing here. And what is here doesn't seem to be consistent. And I'm just wondering whether we can just hold the record open in order to get the full file because just checking off numbers gives me nothing. And I need evidence.

(Tr. 40). The ALJ then concluded that she did not "think [there was] any point in really going further with Dr. Baldwin's testimony until we actually have some treatment notes." (Tr. 41). As previously indicated, exactly one week later, plaintiff's counsel forwarded copies of Dr. Porto's notes to ALJ Horton. (Tr. 1024-37). ALJ Horton concluded in her decision that "Dr. Baldwin's testimony is given little weight because he did not have access to Dr. Porto's treatment notes to resolve these discrepancies." (Tr. 16).

The role of a medical expert is to "aid the ALJ in evaluating the medical evidence." Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 666 (8th Cir. 2003). An ALJ may "consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s) and on whether [the claimant's] impairment(s) equals" the requirements of any listed impairment(s). 20 C.F.R. § 404.1528(f)(2)(iii). The opinion of a medical expert is evaluated in the same way an ALJ evaluates the opinions of treating and non-treating sources, id., with, as plaintiff correctly notes, treating sources being assigned the greatest weight.

It is beyond dispute that Dr. Baldwin's opinion was based on incomplete information -- the absence of Dr. Porto's treatment notes. Plaintiff contends that it is "unreasonable to suggest that a treating physician's notes are not essential to proper review by a physician that has never treated or examined a claimant." (Dkt. #13, at 2). This Court agrees. However, for the reasons stated above, the ALJ's conclusions are supported by substantial evidence.

C. CREDIBILITY

"The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence . . . ." Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). "After weighing any existing inconsistencies between the plaintiff's testimony of pain and limitations and the medical evidence, the ALJ may discount the plaintiff's subjective testimony with respect to the degree of impairment." Romano v. Apfel, No. 99 CIV. 2689 LMM, 2001 WL 199412, at *6 (S.D.N.Y. Feb. 28, 2001)(citations omitted). If an ALJ discredits a plaintiff's testimony, she must do so with sufficient specificity. Id.

In this case, the ALJ concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment[,]" and specifically, the ALJ noted that plaintiff's assertions "regarding his departure" from his last position "[were] inconsistent and [did] not enhance his credibility." (Tr. 13). Plaintiff contends that the ALJ did not properly consider plaintiff's daily activities, the location, duration, frequency and intensity of plaintiff's pain, factors that precipitate or aggravate his symptoms, the type, dosage, effectiveness and side effects of medication, treatment he has received for pain, any measures he uses to relieve pain, and any other factors concerning his functional limitations. (Dkt. #8, Brief at 27-28; see SSR 96-7p, 1996 WL 374186, at *3 (S.S.A. July 2, 1996)).

Plaintiff testified that he was laid off because he "lacked [the] stamina to continue working[,]" and he was not able to meet performance expectations due to physical and psychological problems. (Tr. 24, 136, 144). However, he reported to Dr. Hart that he stopped working when the company fired thirty percent of the managers when a competing

45

business opened. (Tr. 907). Additionally, Dr. Stitelman noted that plaintiff could not work anymore because he was "emotionally burnt-out on jobs." (Tr. 931). A strong indication of the credibility of a claimant's statements is their consistency, both internally and with other information in the case record, so that the ALJ was entitled to consider plaintiff's differing explanations for stopping work. See SSR 96-7p; see Marcus, 615 F.2d at 27. An ALJ must compare a claimant's statements made in connection with his claim, with statements made under other circumstances that are in the case record, and statements made to treating and examining medical sources are especially important. Thus, in that vein, the ALJ noted that plaintiff asserts that he is unable to engage in basic work activities, and he has less than sedentary residual functional capacity, yet in plaintiff's self-reports, he states that he is able to provide for his daily needs (Tr. 11); he prepares his own meals, sweeps, vacuums, does laundry, mows the lawn, drives his wife to work, shops, pays bills, uses the computer, and plays guitar. (Tr. 23, 150-52, 155). The ALJ also noted that Dr. Fynan recorded plaintiff's pain as a "0" on a pain scale, and the medical record does not reflect any treatment for physical issues after April 10, 2008. (Tr. 10; see SSR 96-7p, at *7 ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . .")).

"Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'" Pietrunti v. Dir., Office of Workers Comp. Programs, 119 F.3d 1035, 1042 (2d Cir. 1997), quoting Lennon v. Waterfront Transport, 20 F.3d 658, 663 (5th Cir. 1994). In this case, the ALJ's findings are supported by evidence in the record and are not "patently unreasonable." Id.

## D. USE OF MEDICAL-VOCATIONAL GUIDELINES

Plaintiff contends that the ALJ erred in using the Medical-Vocational Guidelines, or Grid, since the Grid covers only exertional impairments, and not psychiatric disorders. (Dkt. #8, Brief at 28-29). Defendant counters that the ALJ may properly rely on the Grid where "non-exertional limitations have very little effect on the relevant occupational base." (Dkt. #12, Brief at 39-40).

In light of the conclusions reached in Sections IV.A-B <u>supra</u>, the Court need not address this last issue.

## V. CONCLUSION

For the reasons stated below, plaintiff's Motion for Judgment on the Pleadings (Dkt. #8) is <u>denied</u>, and defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. #12) is <u>granted</u>.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen days after service of same)**; Fᴇᴅ. R. Cɪᴠ. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 9th day of March, 2011.

      /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge