## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

DWIGHT JEROLMON,
          Plaintiff,

  v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY

          Defendant.

3:10-CV-267 (CSH)

**June 18, 2012**

## RULING ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

HAIGHT, Senior District Judge:

Plaintiff Dwight Jerolmon applied to the Social Security Administration ("SSA") for Disability Insurance Benefits ("DIB"). The Commissioner of Social Security, in a final decision affirming the ruling of an SSA Administrative Law Judge ("ALJ"), denied Plaintiff's application. Pursuant to § 205(g) of the Social Security Act, §§ 405(g) and 1383(c)(3), Plaintiff sought review in this Court of the Commissioner's decision denying him benefits. Pursuant to 28 U.S.C. § 636(b)(1)(B), the case was referred to Magistrate Judge Joan G. Margolis for a Recommended Ruling. Judge Margolis filed a Recommended Ruling ("R.R.") which, if accepted by the Court, would affirm the decision of the Commissioner and deny Plaintiff disability benefits. Pursuant to 28 U.S.C. § 636(b)(1), Plaintiff filed timely Objections to the R.R. The Commissioner opposes Plaintiff's Objections and seeks this Court's acceptance of Judge Margolis's R.R. This Ruling decides these issues.

1

## I.   STANDARD OF REVIEW

The governing statute, 28 U.S.C. § 636(b)(1)(C), provides with respect to the recourse available to a party displeased by a magistrate judge's recommendation:

> Within fourteen days after bring served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court.  A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive evidence or recommit the matter to the magistrate judge with instructions.

These provisions are echoed and distilled in Fed.R.Civ.P. 72(b)(3): "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."

In the case at bar, ALJ Deirdre R. Horton denied Plaintiff Jerolmon's application for DIB because she found that Plaintiff "has not been under a disability, as defined in the Social Security Act," during the dates embraced by the application.  Decision, Tr. 17.[1]  When an applicant for disability benefits challenges an adverse Social Security disability determination, that agency determination is subject to possible review at three judicial levels: (1) by a magistrate judge to whom a reference is made by a district judge; (2) by the district judge making the reference if objections are filed against the magistrate judge's recommended disposition; and (3) by the court of appeals if an appeal is taken from the district court's judgment.

---

[1]  "Tr." references throughout this Ruling are to the transcript and administrative record submitted to Magistrate Judge Margolis for her review of the case.

2

Notwithstanding the seeming breadth of the "de novo determination" the statute and rule require the district judge to make at level (2), at all levels a court will set aside an ALJ's disability determination "only where it is based upon legal error or is unsupported by substantial evidence." *Flores v. Astrue*, No. 3:09-CV-1829, 2010 WL 5129110, at *1 (D. Conn. Dec. 9, 2010) (citing and quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)) (district court level; ruling on objections to magistrate judge's recommendation). At the court of appeals level, the Second Circuit has repeatedly said of its own proper role: "When considering an appeal of a disability case, we undertake our own plenary review of the administrative record to determine whether substantial evidence supports the Commissioners denial of benefits. We therefore focus our attention on the administrative ruling rather than on the decision of the district court. It is not our function to determine *de novo* whether [the applicant] is disabled, and we may only set aside a determination which is based on legal error or not supported by substantial evidence." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citations and internal quotation marks omitted).

*Flores* illustrates the working of this principle at the district court level: Magistrate Judge Fitzsimmons "conducted a careful and thorough review of the record in this case and found that, in all respects, the ALJ's determination [of non-disability] was based on substantial evidence." 2010 WL 5129110, at *1. District Judge Hall, ruling on the applicant's objections to the magistrate judge's recommended disposition, said: "Reviewing the record, the court finds that the ALJ's account of the record and her determination that Flores was not disabled are supported by substantial evidence." *Id*. at *2.

That is what a "de novo determination" means at all three levels of judicial review of the SSA's denial of disability benefits: On an appeal by a rejected disabilities applicant, the reviewing

3

court, be it magistrate judge, district judge, or appellate panel, focuses *de novo* upon the administrative record and the ALJ's ruling, *not* for the purpose of determining whether the applicant *was* disabled, but for the quite different and more limited purpose of determining whether substantial record evidence supported the ALJ's determination that he or she was *not* disabled.

I will apply this standard of review to Plaintiff's Objections to Judge Margolis's R.R. in this case, and begin with the relevant factual background.

## II.   FACTUAL BACKGROUND

Judge Margolis's R.R. contains a detailed and comprehensive description of the extensive medical treatment Plaintiff has received for the several conditions, physical and mental, which he claims ultimately rendered him disabled within the Social Security context.  Familiarity with that account is assumed for the purpose of this Ruling.  Plaintiff's Objections to the R.R. do not challenge in any material way the accuracy of the R.R.'s medical history, to which this Ruling will make reference.  It is the propriety of the ALJ's conclusions, and Judge Margolis's agreement with those conclusions, that are at issue before this Court.  I have conducted a *de novo* review of the administrative record, with particular focus upon those areas implicated by Plaintiff''s Objections to the Magistrate Judge's R.R., and consistent with the standard of review discussed in Part I., *supra*.

Plaintiff Dwight Jerolmon was born in 1952 and is presently 60 years old.  From 1974 to 2004 Jerolmon was employed by Comcast Cable Company.  He worked as a supervisor/team leader, an active role including the use of machines, tools, equipment and technical knowledge; completion of reports; leading, training, hiring and firing employees; performing and supervising field work attendant upon the installation and repair of cables; and office work.  R.R. at 3-4.  This work was demanding, physically and mentally.

4

Comcast laid Plaintiff off on February 11, 2004, because, according to his presentation to the SSA, he lacked the stamina to continue working, as the cumulative result of several medical conditions. Jerolmon filed his application with the SSA for DIB on January 23, 2008, alleging an inability to perform substantial gainful activity since February 11, 2004. R.R. at 1. The SSA denied the claim in the first instance. Jerolmon, represented by counsel, requested a hearing, which was conducted before ALJ Deirdre R. Horton on August 19, 2009. As recounted in the R.R. at 2-3, Jerolmon testified during the hearing before ALJ Horton that "he is disabled as a result of his hypertensive cardiovascular disease, high blood pressure, and depression." He described his symptoms as consisting of fatigue; constant pain; frequent urination; inability to stand, walk, bend, focus or concentrate for long durations; day and night sweats; frequent diarrhea; depression; anxiety and panic attacks.

Jerolmon has a complicated medical history. According to the R.R. at 6, "around 1998" he was diagnosed with Waldenstrom's macroglobulinemia, a malignant disorder of the blood characterized by the presence of abnormally large numbers of a white blood cell known as B lymphocytes, which can lead to thickening of the blood and an adverse effect upon blood flow through the smaller blood vessels. That condition would not explain all the symptoms Jerolmon described during the SSA hearing; and, in point of fact, beginning is 2003, he was treated or examined by 24 different medical, psychiatric or psychological practitioners with M.D., Ph.D., or A.P.R.N. degrees, as the case may be. These professionals included in their ranks internists, oncologists, a urologist, a dermatologist, a cardiovascular specialist, a liver specialist, psychiatrists, psychologists, and vocational evaluators. Some were treating physicians or psychologists consulted by Jerolmon privately; others were retained by Connecticut Disability Determination Services ("CT

DDS") or by the SSA.[2]  The reports and opinions these practitioners prepared concerning Plaintiff's condition, within the context of their individual specialties, produced a two-volume administrative record transcript of over 1,000 pages.

ALJ Horton discussed and quoted from Jerolmon's extensive medical history in her opinion at Tr. 10-16.  Judge Margolis undertook the same task in her R.R. at 6-29.  I need not reiterate these accounts in full.  The parties do not dispute which practitioner treated or evaluated Jerolmon, when, for what purpose, and what the evaluations said.  It is sufficient for present purposes to say that ALJ Horton, in her consideration of whether Jerolmon is "disabled" within the meaning of the Social Security Act, drew a distinction between physical and mental impairments, and discussed them separately.  I do the same in this Ruling.  However, it is useful to preface that analysis (as did ALJ Horton) with a recitation of the five-step sequential disability evaluation process mandated in such cases by the Regulations, 20 C.F.R. § 404.1520, and Second Circuit decisions, *e.g.*, *Balsamo v. Chater*, 142 F.3d 106 (2d Cir. 1998).

One begins with the proposition that under the Social Security Act, every individual who is

_____

[2]  Culled from the pages of the Magistrate Judge's R.R., the following practitioners who treated or examined Plaintiff, or reviewed his records, are listed herein, following the approximate chronological order of first contact: Lawrence Solomon, M.D. (internist), Arthur Levy, M.D. (oncologist), John F. Setaro, M.D. (cardiovascular medicine), Barry L. Zaret (cardiovascular medicine), Andrew L. Porto, Ph.D. (psychologist), Elizabeth Lincoln, M.D. (internist), Harris J. Foster, M.D. (urologist), James L. Boyer, M.D. (liver specialist), Michael Stitelman, M.D. (psychiatrist), Slawomir Mejnartowicz (internist), Carol Eggers, A.R.P.N. (Yale Medical Group), Thomas Fynan, M.D. (oncologist), Cheryl Walters, M.D. (internist), Mary Tomayko, M.D. (dermatologist), Lance Hart, Ph.D. (psychologist), Marsha Hahn, Ph.D. (psychologist), Luis R. Cruz, M.D. (internist), John Cowan (CT DDS examiner), Joseph Connolly, Jr., M.D. (CT DDS evaluator), Marin Lorenzo, M.D. (internist and SSA evaluator), Janet Jachimowski (CT DDS evaluator), Christopher Leveille, Ph.D. (SSA evaluator), Norman F. Baldwin, Ph.D. (psychologist and impartial expert selected by ALJ Horton to attend and testify at the SSA hearing on Plaintiff's claim).

under a disability is entitled to disability insurance benefits. *See* 42 U.S.C. § 423(a)(1). The statute defines "disability" as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1). Determining whether a particular claimant is disabled requires the familiar five-step process:

First: The ALJ must determine whether the claimant for disability benefits is currently working, and the work is substantial gainful activity. If the claimant is working, the ALJ must conclude that he is not disabled, and his claim will be denied.

Second: If the claimant is not working, the ALJ must make a finding as to the existence of a severe impairment, "which significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, the ALJ must conclude that he is not disabled, and his claim will be denied.

Third: If the claimant is found to have a severe impairment, the ALJ must compare that impairment with those in Appendix 1 of the Regulations ("the Listings"). If the claimant's impairment is listed in the Listings, or is equal to a listed impairment or impairments, the ALJ must conclude that the claimant is disabled, and his claim for benefits will be approved.

Fourth: If the claimant's impairment does not meet or equal one of the impairments included in the Listings, the claimant must show that because of the impairment, he cannot perform his former work.

Fifth: If the claimant shows that because of his impairment he cannot perform his former work, the burden of proof then shifts from the claimant (who carried it during the first four steps) to the Commissioner "to show there is other gainful work in the national economy which the

7

claimant could perform." *Carroll v. Secretary of Health and Human Services*, 705 F.2d 638, 642 (2d Cir. 1983).

In her R.R. at 31, Judge Margolis aptly summarized the interplay of these evaluation steps: "Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment."

ALJ Horton's decision, Tr. 7-17, recited or paraphrased the five disability-evaluative steps, made references to the medical records, declared findings of fact, and answered the questions posed by the Regulations as follows:

First:  Jerolmon was not currently working.

Second:  With respect to his mental condition, the ALJ found that Jerolmon "has depression and anxiety," and that "these are severe impairments since they result in more than minimal limitations on the clamant's ability to engage in competitive work activity on a full-time basis."  Tr. 10.  With respect to the physical complaints and conditions revealed by the medical records (Waldenstrom's macroglobulinemia, Hepatitis C, anemia, hypertension and low back pain), they did not constitute, alone or in combination, a severe impairment as that phrase is used in the Regulations.

Third:  Jerolmon's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of one of the impairments included in the Regulatory Listings.

Fourth:  Jerolmon is unable to perform any past relevant work.

Fifth:  Jerolmon "has the residual functional capacity to perform a full range of unskilled work at all exertional levels," Tr. 12, and "there are jobs that exist in significant numbers in the national economy that claimant can perform."  Tr. 16.

Based upon these findings and conclusions, ALJ Horton held: "The claimant has not been under a disability, as defined in the Social Security Act, from February 11, 2004 through the date of this decision." Tr. 17. The Commissioner affirmed the ALJ's decision by failing to review it in timely fashion.[3] Accordingly, Plaintiff's claim for disability benefits was denied. The Magistrate Judge having recommended that the Court affirm the Commissioner's decision, Plaintiff makes the present Objections [Doc. 16] to that Recommendation.

### III.   PLAINTIFF'S OBJECTIONS

Counsel for Plaintiff, who represented him during the hearing before the ALJ and the proceedings before the Magistrate Judge, objects to the R.R.'s affirming the ALJ's denial of disability benefits on four grounds. Plaintiff asserts the following:

First, the ALJ failed to give proper consideration to Jerolmon's severe physical impairments [Doc. 16] at 1-3. Second, the ALJ failed to follow the treating physician rule and erred in failing to find that Jerolmon had a severe Listed mental impairment [*id.* at 3-6]. Third, the ALJ failed to properly evaluate Jerolmon's credibility [*id*. at 6-8]. Fourth, the ALJ improperly relied upon the regulatory Medical-Vocational Guidelines in measuring Jerolmon's ability to obtain and perform jobs in the national economy [*id*. at 8-9]. The Commissioner's brief in opposition [Doc. 17] contends that none of these objections has merit.

---

[3] Judge Margolis notes in the R.R. at 1: "On January 28, 2010, the Decision Review Board issued its Notice of Decision Review Board Action, informing plaintiff that it did not complete its review within the ninety-day time frame, thus rendering the ALJ's decision the final decision of the Commissioner." This is an acknowledgment by the SSA Decision Review Board, distressingly familiar to district courts, that the Review Board is incapable of performing its statutory function and duties, thereby rendering the agency review process a sham and, in the totality of Social Security circumstances, a cruel hoax.

## IV.   DISCUSSION

I have examined *de novo* those parts of the administrative record relevant or related to Plaintiff's points of objection, to which I apply the standard of review described in Part I. *supra*.

## A.   <u>Severe Physical Impairment</u>

Plaintiff's first objection argues that the ALJ should have found Jerolmon suffers from a severe physical impairment.  I do not agree.

ALJ Horton's decision at Tr. 10-11 summarizes the conclusions of Jerolmon's *treating* physicians that the physical complaints of Waldenstrom's macroglobulinemia, Hepatitis C, anemia, and lower back pain had during the course of treatment been cured or gone into remission.  The ALJ points out that these physicians based their favorable conclusions upon physical examinations of Plaintiff, prescribed medications, and on more than one occasion, Plaintiff's subjective descriptions of his own symptoms or lack of them.

Jerolmon is left to argue, in essence, that the ALJ should have disregarded the evaluations of his treating physicians and his own remarks to them, upon which those physicians relied for diagnostic purposes.  There is a certain irony in this line of argument, since Jerolmon relies heavily upon the "treating physician rule" in support of his following contention, that he suffers from a mental impairment included in the regulatory Listings.  As to a physical impairment, Jerolmon says in his brief that even if his prescribed medication for Waldenstrom's macroglobulinemia put that condition into remission and left him "feeling well" and "doing very well" (quotations from the medical records), he continued to have symptoms, "consistent with medical literature that Waldenstrom's can go into partial remission with a continuation of symptoms."  Plaintiff's Brief on Objections [Doc. 16] at 1-2 (footnote omitted).  As for lower back pain, Jerolmon contends that

10

the ALJ should have accepted his subjective descriptions of continuing disabling discomfort, notwithstanding the absence of objective medical evidence, and concludes: "The ALJ should have required x-rays or an MRI if he felt that one was necessary to develop the record and make a proper determination on the severity of Mr. Jerolmon's back pain." *Id*. at 2-3.

Plaintiff's arguments, while permissible, do not persuade. As for the suggested x-rays or MRIs, Plaintiff's treating physician did not see a need for ordering such tests to evaluate his back pain, and I decline, given the limited standard of review, to impose an obligation on the ALJ to do so. More fundamentally, Jerolmon's contentions, when viewed in the light of the entire record on the point, do not demonstrate a *physical* "impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities," the regulatory definition of "a severe impairment," 20 C.F.R. § 404.1520(c), let alone satisfy the governing standard of review by showing that the ALJ's contrary conclusion is not supported by substantial evidence. The ALJ concluded that Plaintiff is not entitled to a finding of disability based upon a significant physical impairment. As noted *supra*, medical record evidence supporting that conclusion is found in the reports of Plaintiff's treating physicians. Additionally, Dr. Cruz and Dr. Connolly, who examined and evaluated Plaintiff at the request of CT DDS, concluded that Jerolmon had no significant physical impairment. Tr. 14. That medical evidence is substantial, and supports the ALJ's conclusion, adverse to Plaintiff, on the physical impairment issue. In consequence, that conclusion cannot be disturbed by the Court.

**B.    Severe mental impairments**

The ALJ's decision takes a different view of the record evidence with respect to Plaintiff's mental and psychological symptoms and conditions. Unlike Plaintiff's claimed physical ailments,

which the ALJ found did not establish a severe impairment as defined by the Regulations, ALJ

Horton concluded that the medical evidence showed Jerolmon had severe mental and psychological

impairments.  On that issue, the ALJ found:

> A review of the medical records indicates that the claimant has
> depression and anxiety.  These conditions have been diagnosed by
> approved medical sources and confirmed by clinical findings and
> diagnostic studies.  The undersigned finds that these are severe
> impairments since they result in more than minimal limitations on the
> claimant's ability to engage in competitive activity on a full-time
> basis.

Tr. 10.

Accordingly, Plaintiff satisfied the second step in the five-step sequential determination of

disability.  The ALJ's decision summarized what was to happen next in the process:

> At step three, the undersigned must determine whether the claimant's
> impairment or combination of impairments meets or medically equals
> the criteria listed in 20 CFR Part 404, Subpart P, Appendix 1 (20
> CFR 404.1520(d), 404.1525, and 404.1526).  If the claimant's
> impairment or combination of impairments meets or medically equals
> the criteria of a listing and meets the duration requirement (20 CFR
> 404.1509), *the claimant is disabled*.  If it does not, the analysis
> proceeds to the next step.

Tr. 8 (emphasis added).  Thus, at this stage of the process Plaintiff's entitlement to disability benefits

turns upon whether his demonstrated severe mental impairments (depression and anxiety) meet or

equal an impairment included in the regulatory Listings.  The psychological evidence in the record

on that question must be carefully considered, particularly with respect to the manner in which the

ALJ resolved discrepancies between two psychologists:  Andrew C. Porto, Ph.D., Plaintiff's treating

psychologist who saw Plaintiff regularly for several years beginning on May 27, 2005; and Lance

Hart, Ph.D., who saw Plaintiff once, on March 4, 2008, at the request of Connecticut Disability

Determination Services.

In connection with Jerolmon's application for benefits, Dr. Porto submitted three "Psychological Questionnaires" (the ALJ's phrase, at Tr. 15), dated March 17, 2008; June 16, 2008; and March 17, 2009.  Dr. Hart submitted a letter report dated March 4, 2008.  Dr. Porto concluded that Jerolmon's impairment caused by his depression and anxiety was markedly more severe than that expressed by Dr. Hart.  Confronted by this disagreement among experts, ALJ Horton took the sensible step of calling an impartial medical expert to testify at the hearing before her:  Norman H. Baldwin, Ph.D., a psychologist the ALJ qualified as an expert witness.  Tr. 33.  Dr. Baldwin testified that he had reviewed Plaintiff's "medical record," and the ALJ then asked him:  "And is there sufficient medical evidence in the record to form an opinion as to the claimant's medical health status?"  *Id.*

The main thrust of Dr. Baldwin's response to that core question is summarized in the ALJ's decision at Tr. 15-16:

> Dr. Baldwin reviewed the claimant's mental health records from Dr. Porto and the records of the DDS examiner [Dr. Hart] and initially concluded that the claimant had major depressive disorder and met Listing 12.04.   However, Dr. Baldwin noted that there were inconsistencies in the record such as Dr. Porto's opinion of marked limitations and his assignment of an extremely low global assessment functioning score (35) and Dr. Hart's observation that the claimant was cognitively intact and had only mild to moderate limitations in dealing with the public.

That summary is accurate as far as it goes, but given the centrality of importance of this evidence, I think it advisable to quote Dr. Baldwin's testimony at greater length.  By "centrality of importance" I mean that, if one accepts Dr. Baldwin's initial conclusion that Jerolmon "met Listing 12.04," then the ALJ was bound in law to find him disabled, since "12.04," the designated listing

13

for "Affective Disorders," is included in the regulatory Listings found in 20 C.F.R. Part 404, Subpart

P, Appendix 1, and the inclusion of a particular impairment in the Listings mandates the conclusion

that the afflicted claimant is "disabled" under the statute.

What follows are quotations from the transcript of Dr. Baldwin's testimony on August 19,

2009 before ALJ Horton. Plaintiff and his attorney were present. The only change I have made to

the transcript, Tr. 33-42, is to correct the spelling of some physicians' names. After Dr. Baldwin was

qualified by ALJ Horton as an expert witness, the following testimony was given and rulings made:

> ALJ HORTON: And doctor, you've had an opportunity to review the
> medical record?
>
> DR. BALDWIN: I have, Your Honor.
>
> ALJ HORTON: And is there sufficient medical evidence in the
> record to form an opinion as to the claimant's mental health status?
>
> DR. BALDWIN:[4] The claimant and the records indicate the claimant
> has been treated for outpatient psychotherapy most recently by Dr.
> Andrew Porto, and also he has seen a psychiatrist, Dr. Stitelman. I
> am not sure if he currently sees Dr. Stitelman. And Dr. Stitelman
> indicated as of the time that he submitted his report that he had seen
> the claimant three times and that report was dated March 14th, 2008.
> Dr. Stitelman also indicated issues with anxiety and panic attacks.
> And also discussed some of the medical issues, above and beyond the
> depression and anxiety and stated that at the time he saw him, he was
> taking 100 milligrams of Zoloft and one milligram of Clonazepam.
>
>   According to Dr. Porto and his comments on Exhibit 30F, Dr. Porto
> has seen the claimant since 5/27/05 up to the, at least March and
> presumably up to the present. Weekly and as needed, diagnoses, he

---

[4] Before responding to that question, Dr. Baldwin, with the ALJ's permission, put some
questions to Plaintiff about one aspect of his daily conduct. Plaintiff responded. Tr. 33-35.
Those exchanges are not relevant to the issues discussed in text, and I omit them.

offers a diagnosis of a, a recurrent depression, DSM-IV 296.30,[5] with a GAF for the past year of 35.[6]  Dr. Porto also reports symptoms of mood disturbance, social withdrawal, decreased energy, obsessions generalized, and persistent anxiety.  The medication which he apparently has been, the psych medications of Zoloft and Clonazepam appear to have been ongoing and not changed that much over the last several years.

Dr. Porto also in his report went on to offer some ratings and felt that there was marked impairment to understand and remember instructions, to maintain attention and concentration, to perform activities within a schedule, with maintaining regular attendance and being functional, with working in coordination with, in proximity to others without being distracted by them.  And that he also had a marked impairment for completing a normal work week, accepting instructions and responding to criticism from supervisors, a marked impairment for an ability to get along with co-workers and peers without distracting them, to respond to changes appropriately in a work setting, all of these are marked; to travel to unfamiliar places and to set realistic goals or make plans independently.

He felt that the claimant's ability to work outside the home is markedly, markedly limited and also noted chronic fatigue.  Also noted that the claimant can be intolerant or "very intolerant of opinions different from his own." He felt the prognosis was poor due to a combination of physical and emotional health issues.  So, the claimant certainly seems to present with the criteria for a major depressive disorder with features of anxiety.  And this appears to be

---

[5]  I have corrected this reference, which appears in the transcript as "DSM 4926.30."  Dr. Porto's report, Hearing Exhibit 30F which appears at Tr. 1016 of the record, contains the notation "296.30" under the caption "DSM-IV - Axis I."  "DSM-IV" is a reference to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, published by the American Psychiatric Association.

[6]  "GAF" is a reference to the Global Assessment of Functioning Scale, a numerical shorthand included in DSM-IV and used by mental health practitioners to document how a patient is doing overall mentally.  A rating within the range 31-40 is described as indicative of "some impairment in reality testing or communication," **OR** "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." (emphasis on the disjunctive in the original).

consistent with a listing level 12.04.[7]

ALJ HORTON:  Well, the questionnaire is without any notes, treatment notes, or are there treatment notes?

DR. BALDWIN:  I don't see any treatment notes.  So, let me just go back and see here.

ALJ HORTON:  So simply relying upon the check-offs is what the basis for your finding that it meets —

DR. BALDWIN:  Both his comments and Dr. Stitelman's letter, Exhibit 7F, and I don't know that there's other, and I was looking for other independent information which I don't see.

COUNSEL FOR CLAIMANT:  Did you say 7F, doctor?

DR. BALDWIN:  I had 7F for Dr. Stitelman.

COUNSEL FOR CLAIMANT:  The letter in 7F, he also has a letter in 16F.

DR. BALDWIN:  And also, I was looking at 10F, an independent evaluation by Dr. Hart, I believe for DDS.  In looking at the last page of Dr. Hart's report, I will quote:  "So, I think that his limitations from depression and anxiety would be moderate for persistence.  One would expect that with a much simpler job, a routine, repetitive job, a job where he's not involved with any supervision and everything is routine that it would reduce the kind of triggers that were in his old job and make it so that he could relate to supervisors and other co-employees much better.  He still would have some limitations, mild to moderate, in terms of his ability to work with and behave normally with co-workers and supervisors."[8]

------

[7]  This reference appears in the transcript as "1204."  It is clearly a reference to the regulatory Listings in 20 C.F.R. Part 404; the period between "12" and "04" in the Listing was omitted from the transcript, presumably by inadvertence.  I have corrected the transcript to show the correct reference.

[8]  I have inserted quotation marks in this paragraph in order to identify with precision the language from Dr. Hart's report that Dr. Baldwin was quoting at this point in his testimony.  The last page of Dr. Hart's report, from which Dr. Baldwin was reading, is at Tr. 909 in the record.

16

Now that report dated 3/4/08 was based on Dr. Hart's independent valuation, presumably based on one or two visits, and - - -

CLAIMANT:  And that was one visit.

DR. BALDWIN:  One visit, okay.

CLAIMANT: Uh-huh.

DR. BALDWIN:  So, I don't, it does[9] seem to dovetail with Dr. Porto's evaluation or his response to the questionnaire.  It is, would be desirable, to see Dr. Porto's progress notes, which I don't see, or some other narrative report from Dr. Porto who has worked with the claimant since 2005.

ALJ HORTON:  Well, an individual who has a GAF score of 35 as my understanding, that individual generally would be hospitalized at that level, or close to it.

DR. BALDWIN:  Yeah.

ALJ HORTON:  The statements that he would have mild to moderate limitations in behaving normally with co-workers and mild, a simpler job would reduce the triggers, cognitively he's reasonably intact, don't suggest to me a 35.  Is that consistent with a 35 GAF?

DR. BALDWIN:  It, it appears from what I can see that when talking with the claimant, one wouldn't immediately sense that there was an, an issue with a depressive disorder, but that it comes out more behaviorally.  I want to just revisit doctor - - well, let me get to 30F again.

(There was a brief interruption for a restroom visit requested by the claimant.)

ALJ HORTON:  And when we were talking previously, Dr. Baldwin, we were discussing the difference essentially between Dr. Hart's opinions and Dr. Porto's conclusions in his - -

_____

[9]  Thus in transcript at Tr. 38.  *Quaere* whether, in the light of Dr. Baldwin's subsequent testimony reproduced in text, "does" should read "doesn't."  The ALJ's decision reflects her understanding that Drs. Porto and Hart disagreed with each other in their evaluations of Jerolmon's mental condition.

DR. BALDWIN:  Uh-huh.

ALJ HORTON:  - - questionnaire and whether they were consistent, that Dr. Hart's opinions were consistent with a 35 GAF.

DR. BALDWIN:  I, I, I, too, would question the 35 GAF.  I'm also reviewing another exhibit here which is 29F.[10]  And that psychologist also notes sleep - - in reviewing the record, not having anything from the client, claimant, notes a sleep disturbance, difficulty concentrating - -

ALJ HORTON:  Well, it just seems to me that without Dr. Porto's actual treatment records, and whether this is a new problem, an old problem, been going on since 2004 on a consistent basis, whether he's compliant with treatment, whether there's  - - I don't, there's nothing here.  And what is here doesn't seem to be consistent.  And I'm just wondering whether we can just hold the record open in order to get the full file because just checking off numbers gives me nothing.  And I need evidence.

COUNSEL FOR CLAIMANT:  If we would be able to get Dr. Porto's treatment records for you. . . . If it's necessary, perhaps we could subpoena the records from doctor, the treatment progress notes from Dr. Porto.

ALJ HORTON:  Well, why don't we do this?  Why don't you try and obtain them first and then if you're unsuccessful, then we'll subpoena them.

COUNSEL FOR CLAIMANT:  Thank you, Your Honor.

ALJ HORTON:  Okay?  So I'll hold the record open for 30 days and if you find that he's not going to submit them, just send us a letter and let us know that.

COUNSEL FOR CLAIMANT:  Thank you.  19th of September?

ALJ HORTON:  Yes. All right, then, I don't think there's any point in really going further with Dr. Baldwin's testimony until we actually have some treatment notes.  So is there anything else at this point?

---

[10]  Hearing Exhibit 29F is a Psychiatric Review Technique Form prepared by Christopher Leveille, Pys.D., to which the ALF's decision refers at Tr. 15.

COUNSEL FOR CLAIMANT:  No, Your Honor.

ALJ HORTON:  Okay.  So why don't we, we'll close the hearing.  We'll hold the record open for 30 days in order to get Dr. Porto's treatment notes.

CLAIMANT:  Okay.

ALJ HORTON:  And thank you very much, Dr. Baldwin.

DR. BALDWIN:  Thank you.

 Whereupon, the hearing before the ALJ was closed, at 1:45 p.m. on August 19, 2009.

Counsel for Plaintiff sent ALJ Horton a letter dated August 26, 2009 (Tr. 1024) which enclosed Dr. Porto's treatment notes, consisting of 13 pages of handwritten notes (Tr. 1025-1037) describing some 32 hourly sessions Dr. Porto conducted with Jerolmon, the first on May 27, 2005 and the last on March 17, 2009.

The ALJ did not pass Dr. Porto's treatment notes on to Dr. Baldwin so Dr. Baldwin could study them, or recall Dr. Baldwin to a reopened hearing so he could testify about the notes' effect, if any, upon the strength  of Dr. Porto's recorded opinion that Plaintiff suffered from a Listed severe mental impairment.  Instead, the ALJ read Dr. Porto's notes herself, and then delivered her decision on October 20, 2009, rejecting Plaintiff's claim of disability.  At page 13 *supra*, I quoted that part of the ALJ's decision which describes the discrepancy Dr. Baldwin, during his testimony, perceived between Dr. Porto's opinion (favorable to Jerolmon on the question of mental disability) and that of Dr. Hart (unfavorable).  The ALJ's decision resolves that discrepancy in this fashion:

> Dr. Baldwin testified that he did not have access to Dr. Porto's treatment notes to resolve the discrepancies.  Dr. Baldwin's testimony is given little weight because he did not have access to Dr. Porto's notes to resolve these discrepancies.

19

Tr. 16.

To my mind, this observation by the ALJ introduces an almost surreal note of mystery into the case.  Dr. Baldwin, the impartial expert selected by Judge Horton to advise her, "did not have access to Dr. Porto's notes to resolve these discrepancies" because the ALJ, for unrevealed and unstated reasons, withheld Dr. Porto's notes from Dr. Baldwin.  The element of mystery is present because any reasonable person, present at the hearing and witnessing the exchanges quoted in the text, would have understood that the ALJ was keeping the record open so that Dr. Porto's notes could be obtained *and given to Dr. Baldwin to study*.  That seems to me the only rational construction that can be placed upon the ALJ's closing remark:  "I don't think there's any point in really *going further with Dr. Baldwin's testimony* until we actually have some treatment notes."  Tr. 18.  That is the only construction that makes sense of the surrounding circumstances.  After all, it was Dr. Baldwin who stressed the discrepancy between the opinions of Drs. Porto and Hart, and Dr. Baldwin who stated explicitly that in order to resolve that discrepancy, he needed to read Dr. Porto's treatment notes, if at all possible.  Well, as it turned out, it was perfectly possible for Dr. Baldwin to read Dr. Porto's notes.  Plaintiff's counsel obtained them and passed the notes on to the ALJ a week after the hearing.  But the ALJ did not pass the notes along to Dr. Baldwin.  Instead, two months later she handed down a decision which denigrated Dr. Baldwin's testimony "because he did not have access to Dr. Porto's treatment notes to resolve those discrepancies."  And, one may ask rhetorically, who was responsible for that lack of access on Dr. Baldwin's part?[11]

The question on this judicial review of the Commissioner's denial of Plaintiff's disability

---

[11]  The analogy is not perfect, but these puzzling circumstances call to mind the familiar, if, one hopes, apocryphal concept of the child who murders his parents and then asks the court for leniency because he is an orphan.

claim is whether these particular circumstances, mysterious or not, make any difference.   The
Commissioner argues before this Court that the ALJ's choosing not to pass Dr. Porto's notes on to
Dr. Baldwin makes no difference because ALJ Horton read the notes and there is nothing material
to the issue in them.   The ALJ says in her decision:

> Dr. Porto's opinions are given little weight because his treatment
> notes do not support the significant restrictions assigned in the
> Questionnaires.[12]   For the most part, the treatment notes are a merely
> a recitation of the session and contain no assessments of the
> claimant's state of mental health or diagnostic impressions.
> Moreover, the content of the notes is fairly benign and does not
> support the significant limitations assessed by Dr. Porto.   Between
> contemporaneously recorded treatment notes and purpose-driven
> letters of support, the undersigned finds more candor and credibility
> in the former.

Tr. 15.

I cheerfully concede that ALJ Horton has read more psychology Ph.D.s' opinions and
treatment notes than I have.   Nonetheless, and meaning no disrespect, she and I, as well as the
attorneys for the parties, are lay people when it comes to understanding and interpreting densely
packed handwritten treatment notes written by a psychologist like Dr. Porto over a four-year span
of frequent psychotherapy sessions.   I find myself, again meaning no disrespect, unable to repose
sufficient confidence in the ALJ's interpretation of Dr. Porto's treatment notes.   What is one to
make, for example, of Judge Horton's view that the notes are mere recitations of sessions "for the
most part," or that their content "is fairly benign"?   When one lay reader of professional documents
uses qualifying phrases such as these, they run up red flags, at least in the eyes of this lay reader.

I conclude without difficulty that the professional interpretation of Dr. Porto's treatment

---

[12]   This is a reference to the three Questionnaire forms in evidence, executed by Dr. Porto,
the last one of which contains the Listing designation of 12.04 and a GAF of 35.

notes should have been made by that other professional, Dr. Baldwin, whose function it was to evaluate Plaintiff's medical records, and not by a lay ALJ.  This is clearly what everyone expected to happen at the conclusion of the August 2009 hearing, which broke off with the record kept open so that Dr. Porto's notes could be obtained, and I hold that is what should have happened.

The circumstances of the case are unusual.  Its resolution is more a function of common sense than following appellate authority that is closely on point.  The Commissioner relies upon *Adams v. Massanari*, 55 Fed.Appx. 279, 2003 WL 173011 (6th Cir. Jan. 23, 2003), where during the course of a hearing the impartial expert, the ALJ, and the disability claimant's attorney agreed that they needed more information regarding the claimant's arthritis; Dr. Epstein, a rheumatologist, examined the claimant and issued a post-hearing report; and the ALJ denied the disability claim:  "without submitting Dr. Epstein's report to the ME, the ALJ considered and dismissed Dr. Epstein's report for lack of probative value."  55 Fed.Appx. at 286.

The Sixth Circuit found no fault with this procedure.  *Adams* bears a surface resemblance to the case at bar, in that an ALJ reached a decision adverse to a disability claimant without passing a medical report on to the medical expert in the case (the counterpart to Dr. Baldwin).   However, the rheumatologist's report in *Adams* noted objectively that there was "not any significant restriction of the function of Appellant's arthritic joints," *id*., which was apparently sufficiently clear for the ALJ to reject the disability claim without more.  In the case at bar, what the ALJ failed to pass on to the medical expert was four years' worth of a treating psychologist's treatment notes, which would seem to pose quite different, and more complex and difficult, questions of comprehension and interpretation.

In any event, I derive my principal guidance from Second Circuit cases.  *Pratts v. Chater*, 94

F.3d 34 (2d Cir. 1996), which differs from the case at bar in some factual respects, is nonetheless

instructive on the broader issues.  The ALJ denied disability benefits after a hearing where the only

witness beside the claimant was "Dr. Edgar Bonilla, a medical expert called by the SSA who based

his opinions on his review of Pratts's records from the VA. Unfortunately, the hearing tape was

mistakenly turned off for a portion of Dr. Bonilla's testimony, leaving a significant gap in the

administrative record."  94 F.3d at 36-37.  The Second Circuit vacated the Commissioner's denial

of benefits and remanded the case to him for further proceedings.  I quote the court of appeals'

opinion at some length because it contains language strikingly applicable to the case at bar:

> It is the rule in our circuit that the ALJ, unlike a judge in a trial,
> must [her]self affirmatively develop the record in light of the
> essentially non-adversarial nature of a benefits proceeding. This duty
> arises from the Commissioner's regulatory obligations to develop a
> complete medical record before making a disability determination, 20
> C.F.R. § 404.1512(d)-(f) (1995), and exists even when, as here, the
> claimant is represented by counsel.  Based on the administrative
> record before us, we believe that the ALJ did not fulfill her duty in
> Pratts's case in several respects.  We therefore find that her decision
> to deny Pratts benefits is not supported by substantial evidence.

> First, and most remarkably, the hearing record upon which the ALJ
> relied was significantly compromised by the failure to transcribe a
> portion of Dr. Bonilla's testimony.  In a case such as this, where the
> assessment of disability involves careful consideration of medical
> evidence, the testimony of the only medical expert must figure
> prominently in the ALJ's decision making.  Indeed, the ALJ referred
> extensively to Dr. Bonilla's testimony in her evaluation of the
> medical evidence and stated that she agreed with his conclusions.
> Without the benefit of a complete transcript, however, the bases for
> these conclusions were lost to the ALJ, the Appeals Council, the
> district court, and now to us.  It is surprising that the Appeals Council
> did not remedy this problem at the first level of review by granting
> Pratts a new hearing.  Faced with such an incomplete record of
> Pratts's hearing, we of course cannot say the ALJ's decision is
> supported by substantial evidence.

> Second, it appears to us that even if we were to disregard the missing testimony, the record before us is simply inadequate to support a denial of benefits.  Much of Pratts's medical history is missing, including his initial; diagnosis of HIV, *treatment notes* for the period August 1987-September 1988, lab results for blood tests and other prescribed tests, identification of some medications, and *treatment notes* from his social worker.  Moreover, the medical records that do appear in the record are frequently incomplete or illegible and provide no coherent overview of Pratts's treatment.  The only expert medical testimony is that of Dr. Bonilla, who relied exclusively on the materials in this record to form his opinion that Pratts was capable of light work.  The sole evidence before the ALJ refuting Pratts's claims of disabling pain and illness, therefore, was an incomplete medical history and an expert opinion rendered from it.  Such a record offers us no basis to find the substantial evidence necessary to uphold the ALJ's decision.

94 F.3d at 37-38 (emphases added) (citations to cases and internal quotation marks omitted).

*Pratts* and the case at bar present different procedural postures.  The ALJ in *Pratts* relied upon the hearing testimony of the impartial medical expert (Dr. Bonilla), although the transcript of Dr. Bonilla's testimony in the record was incomplete.  In the case at bar, the ALJ discounted the hearing testimony of the impartial medical expert (Dr. Baldwin) because Dr. Baldwin had not examined the treatment notes of the claimant's treating psychologist (Dr. Porto) (although the ALJ had obtained those treatment notes and unaccountably failed to pass them on to the expert, who had requested them in the first instance).  However, the Second Circuit in *Pratts* stressed the Commissioner's "regulatory obligations to develop a complete medical record before making a disability determination," and in the face of that overarching obligation, born of principles of fairness, this procedural difference is of no moment.

*Pratts* identifies an impartial medical expert in a disability case as the key witness.  In the case at bar, Dr. Baldwin laid emphasis upon Dr. Porto's role as Jerolmon's treating psychologist over

a number of years, and correctly noted Dr. Porto's opinion that Jerolmon suffered from a severe mental impairment *that was Listed*, with the designation 12-04. Dr. Hart, who examined Jerolmon on one occasion on behalf of the DDS, reached a different and more benign assessment of his capabilities. Dr. Baldwin made it clear, in his abbreviated testimony at the abbreviated hearing, that he could not express an opinion about whether Dr. Porto's or Dr. Hart's evaluation was correct without first examining Dr. Porto's treatment notes (Dr. Hart had no treatment notes because he never treated Jerolmon). Consider: If Dr. Baldwin, having examined Dr. Porto's notes, concluded that they were inconsistent with or did not support a 12.04 impairment assessment, one could not easily contend that substantial evidence did not support the ALJ's decision that Jerolmon was not disabled; but if Dr. Baldwin concluded that Dr. Porto's treatment notes supported that assessment, Jerolmon would be entitled in law to be classified as disabled, unless some persuasive reason existed for disregarding the opinions of the impartial medical expert and the treating psychologist.

While ALJ Horton read Dr. Porto's treatment notes and interpreted them in a manner adverse to Plaintiff's claim, in the particular circumstances of this case I am not prepared to accept the views of a lay person, however distinguished in law, as a substitute for a medical expert in the rendition of a medical/psychological opinion. Dr. Baldwin's inability to examine Dr. Porto's treatment notes, and his consequent inability to arrive at an informed opinion on the decisive medical question in the case, render Plaintiff's medical history record incomplete to a degree comparable to that identified by the Second Circuit in *Pratts.*

Having taken that view of the case, I respectfully cannot accept Judge Margolis's statement that "Dr. Porto's opinion was not consistent with his own treatment notes," R.R. at 43, whether one reads it as an expression of ALJ Horton's interpretation of the notes or that of the Magistrate Judge:

no matter, in either event the interpreter is a member of the laity, and a professional opinion on the point from Dr. Baldwin is necessary to complete the medical record.  For similar reasons, I cannot agree with Judge Margolis's conclusion at 44 n.31 that, although she agreed with Plaintiff's contention that it is "unreasonable to suggest that a treating physician's notes are not essential to proper review by a physician that has never treated or examined a patient," nonetheless "the ALJ's conclusions are supported by substantial evidence."  Given the unusual circumstances in this case, where the necessity of Dr. Baldwin's review of Dr. Porto's notes was agreed upon in principle by all concerned, and then abandoned by the ALJ in practice, the resulting gap in the medical record on the decisive question renders that record so incomplete that, to quote *Pratts* again, this Court "cannot say the ALJ's decision is supported by substantial evidence."

For these reasons, the Court will grant neither Plaintiff's motion for judgment on the pleadings nor the Commissioner's motion to affirm his decision.  The Commissioner's decision denying Plaintiff disability benefits will be vacated, and the matter remanded to the Commissioner, with instructions that the ALJ send Dr. Porto's treatment notes to Dr. Baldwin forthwith and then reopen the hearing, so that the testimony of Dr. Baldwin may be resumed, subject to cross-examination by counsel for Plaintiff.  Having heard further testimony from Dr. Baldwin, the ALJ may then wish to consider whether compliance with "the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination," *Pratts,* 94 F.3d at 37, may require her to call Dr. Porto to testify at the reopened hearing, but the Court leaves that to the ALJ in the first instance.

## C.    Other Questions

I do not agree with Plaintiff that the ALJ's decision impermissibly denigrated Plaintiff's

credibility with respect to his subjective symptoms and complaints.  The ALJ correctly observed that the credibility of testimony describing such symptoms, when "not substantiated by objective medical evidence," must be evaluated "on a consideration of the entire case record."  Tr. 12.  The ALJ undertook to do that.  The case turns upon which of the conflicting psychological evaluations should be accepted after the entire medical case record is completed on remand.

The significance to be given Dr. Porto's role as a *treating* psychologist is sufficiently reflected by the Court's order of remand.

Plaintiff contended before the Magistrate Judge that the ALJ erred in using the Medical-Vocational Guidelines, or Grid, in computing Plaintiff's residual functional capacity (fifth step of the disability evaluative process).  Plaintiff's theory is that the Grid covers only exertional impairments, and not psychiatric disorders.  The ALJ's decision said that the claimant's "ability to perform work at all exertional levels has been compromised by nonexertional limitations.  However, these limitations have little or no effect on the occupational base of all exertional levels."  It followed, the ALJ concluded, that "A finding of 'not disabled' was "appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines."  Tr. 16-17.

The Magistrate Judge's Recommendation did not find it necessary to reach this question.  R.R. at 47.  On remand, the ALJ should revisit the issue, taking into consideration any additional evidence adduced at the reopened hearing.  Guidance in this area is provided by the Second Circuit in *Pratts v. Chater*, 94 F.3d at 39:

> We therefore conclude that on remand, the ALJ must conduct a re-evaluation as to whether the Commissioner has demonstrated that Pratts's ability to perform the full range of light work was not significantly diminished by his nonexertional impairments.  If the ALJ finds that Pratts's ability is significantly diminished, the

Commissioner should be required to present the testimony of a vocational expert or other evidence concerning the existence of jobs in the national economy for an individual with Pratts's limitations.

## V.   CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings [Doc. 8] is DENIED.  Defendant's Motion to Affirm the Decision of the Commissioner [Doc. 12] is DENIED.  The Court does not adopt the Recommended Ruling [Doc. 15].

The case is REMANDED to Defendant for further proceedings consistent with this Ruling. The Clerk is directed to close the case.

It is SO ORDERED.

Dated: New Haven, Connecticut
June 18, 2012

_____/s/ Charles S. Haight_____
Charles S. Haight, Jr.
Senior United States District Judge